COBB, Judge.
Brandon Washington appeals from his capital-murder conviction for murder committed during the course of a robbery, § 13A-5-40(a)(2), Ala.Code 1975, and the sentence of death imposed as a result of that conviction. We remand this case for further proceedings.
A Jefferson County grand jury charged Washington with murdering Walter Justin Campbell by shooting him with a pistol during the course of a robbery. Washington was tried before a jury on January 10 through 13, 2006, and was convicted as charged. After a penalty-phase hearing before the jury, the jury recommended by a vote of 11-1 that Washington be sentenced to death. At the March 27, 2006, sentencing hearing, the trial court considered the aggravating circumstances and the mitigating circumstances and imposed the death sentence. This appeal follows.
Washington does not challenge the sufficiency of the evidence, so only a brief recitation of the evidence presented at trial will be provided. The State’s evidence tended to show the following. Twenty-year-old Campbell, a married father of a two-year-old child, had gone to work at the Radio Shack store in Huffman on January 16, 2005. He typically worked at another Radio Shack store, but was assigned to work at the Huffman store because another worker was on vacation and because thefts had been reported at that store and Justin was to watch for the culprits. A manager for Radio Shack testified that she spoke with Justin at approximately 4:45 or 5:00 p.m. that day. When Justin’s wife, Rhonda, was unable to contact him at the end of the day, she telephoned his father, Stephen Campbell, who lived nearby. Stephen drove to the Radio Shack store and noticed that Justin’s car was still in the parking lot. He entered the store, which was unlocked, and called loudly to Justin. As he walked to the back of the store, he saw his son’s feet and thought that perhaps Justin had been tied up. As he stepped into the back room of the store, he saw that Justin had been shot; he was dead. Stephen knelt down beside his son to say a prayer, and then he walked out of the store and dialed 911 for emergency assistance. A Birmingham police officer who was patrolling the area saw Stephen *426 outside the Radio Shack waving his arms frantically. When the officer stopped, Stephen told her, “They shot my baby.” (R. 353.)
The autopsy revealed that Justin had been shot in the back of the head from an intermediate distance with a .357 or .38 caliber weapon. The weapon was not recovered. $1,050 had been stolen from the store, and Justin’s wallet had been taken.
Eighteen-year-old Brandon Washington had been a sales associate at the Huffman Radio Shack store for several months, but his employment had been terminated earlier in January for failing to report to work. After his employment was terminated, he attempted to transfer to another store, and he was “aggravated” when he learned that his employment had been terminated for failing to report to work. (R. 307.) Washington scheduled a meeting with the district manager about the termination, but Washington did not attend the scheduled meeting.
Evidence was collected at the scene and items of clothing were collected at Washington’s apartment and from his vehicle. Forensic tests of that evidence did not connect Washington to the crime.
Michael Dixon, who testified at Washington’s trial that he was best friends with Washington, lived with his parents in their house, which was 3.9 miles from the Radio Shack store. Dixon testified that Washington was a frequent and welcome visitor at his parents’ house, and that on the day of the murder Washington came to his house between 5:00 and 5:30 p.m. He testified that Washington said nothing to him about the murder at Radio Shack, that he did not see a gun, and that Washington did not change clothes at his house, Dixon also testified that he had previously given statements to the police, and that he had told the police that when Washington came to his house on the day of the murder, he had shown Dixon a .357 handgun and money that he had taken in a robbery at Radio Shack. Dixon told the police that Washington had told him that he shot the Radio Shack employee in the head. In his statement to the police, he said that Washington had changed his clothes at the house and that when he left he took the clothes with him. Dixon also told police that he had found the .357 caliber handgun and that he had given it to Washington because Washington had wanted it. On cross-examination, Dixon testified that the statements he gave to the police were false, that Washington did not have a gun or money with him on the day of the murder, that Washington did not change his clothing at Dixon’s house, and that he did not admit to killing a Radio Shack employee. He testified that he made those statements because the police threatened to charge him with capital murder and to lock up his family if he did not tell them what they wanted to hear.
Leon Oden, Dixon’s stepfather, testified that Washington was like a son to him and that Washington was always welcome at his house. Oden recalled a time when Washington had gotten into his house before Oden arrived there; he did not know how Washington had gotten into the house. Oden testified that he had owned a .357 handgun that he had kept in his nightstand in his bedroom. He put the weapon in the nightstand in 2001, when he moved into the house, and he did not check on it again until late in January 2005, after the murder. The gun was no longer in the nightstand, and Oden contacted the police and filed a report about the missing weapon. Oden stated that Washington came to his house at approximately 5:00 p.m. on the day of the murder.
Detective Roy Bristow testified that he was the lead investigator on the robbery-murder of Justin Campbell. He testified *427 about the crime scene and about the investigation. He stated that none of the fingerprints at the scene matched Washington’s, but it would not have surprised him if Washington’s prints had been there, because he had worked at the store. Only one fingerprint matched the victim. Det. Bristow testified that Washington was considered a suspect early in the investigation because his employment at the Radio Shack store had recently been terminated. He also testified that, on January 20, 2005, a woman placed an anonymous telephone call to the police and told them she had information about the murder. She told Det. Bristow that a female friend of hers had told her that, on January 16, 2005, Washington had killed a man at the Radio Shack store, and he had disposed of the gun.
Det. Bristow testified about his investigation and the interviews he conducted. He stated that during the investigation, Washington became the primary suspect and that he had received similar information about Washington’s role in the robbery-murder from his interviews with Michael Dixon; April Eatmon, Washington’s former girlfriend; and Verrick Taylor, who had been a case manager of Washington’s at a group home years earlier.
April Eatmon testified that a day or so after the robbery-murder, Washington contacted her and said he wanted to speak to her. When she met with Washington, he told her that he had gone to the Radio Shack store, that he took Justin’s wallet and some money from the store, and then he took Justin to the back of the store and shot him. He said he went to Mike’s house following the shooting. Eatmon said that Washington told her that he threw the money from the robbery onto Mike’s bed to show Mike, that he burned the clothes he was wearing at the time of the crime, and that he threw the murder weapon off a cliff.
Verrick Taylor testified that he had worked for a foster-care agency several years earlier and that Washington was one of his foster-care cases. He said that he had initially met Washington when Washington was 12 or 13 years old and was living in a group home. Taylor said that he and Washington remained in contact after Taylor left the foster-care agency. Taylor had told Washington that he would be there for him if he needed to talk about college choices or relationship issues, and he said that Washington telephoned him on occasion. During the weekend of the murder, Washington telephoned Taylor and said he wanted to talk. Washington went to Taylor’s house the day after the murder and told Taylor that he was in something “ ‘real deep.’ ” (R. 713.) Washington told Taylor that he had gone to the Radio Shack store where he had been employed and that he had told the employee working there to tell him where the money was. He told Taylor that the employee had repeatedly pleaded for his life and said that he had a two-year-old child. Washington told Taylor that he directed the employee to get on the floor and he shot the employee in the head. Washington said he grabbed the money and a videotape from the security camera and left. He said he went to the woods, buried the gun, burned the clothes he had worn during the commission of the crime and the videotape so there would be no evidence, and he kept the money. Taylor said that Washington pulled two stacks of money out of his jacket and showed them to Taylor. The following day, Taylor telephoned Washington. Washington mentioned Det. Bristow. Taylor stated that, on January 19 or sometime thereafter, he telephoned a citizen crimes reporting program known as Crime Stoppers to report the information Washington had given *428 him. He said that he had developed a relationship with Washington during the previous years and that he had wrestled with the decision about disclosing to authorities the information about Washington. Taylor gave the information to Det. Bristow when Det. Bristow later came to Taylor’s house.
After the jury found Washington guilty of capital murder, additional evidence was presented at the penalty phase of the trial. The State presented testimony from Justin’s parents. The defense presented testimony from Amanda Washington, Washington’s maternal grandmother. She said that Washington’s mother “got strung out on drugs” and “ran off with a drug dealer,” and that she had adopted Brandon when he was 13 years old. (R. 879.) She further testified that her grandson had been in two foster homes and a youth home. He had graduated from high school before the murder.
Washington’s aunt and sister also testified on his behalf and they pleaded with the jury to impose a sentence of life imprisonment without parole.
I.
Washington first argues that the trial court erred to reversal when it allowed testimony from Michael Dixon and April Eatmon and when it allowed testimony about their statements to the police. He argues that the witnesses and their statements were “fruits” of a conversation Washington had with Officer Pinkney Too-son before he had been given his Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings. The trial court suppressed the statements Washington made to Tooson, finding that they had been made while Washington was in custody but without the benefit of the Miranda warnings. He argues that the evidence from Dixon and Eatmon was not discovered independently of Tooson’s statement and that their testimony and statements should have been suppressed too. Washington did not raise this argument in the trial court, so we review it for plain error.
“Plain error has been defined as a defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala. R.App. P., provides:
“ ‘In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.’ ”
“ ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. *429 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).’
“Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001).”
Beckworth v. State, 946 So.2d 490, 501-502 (Ala.Crim.App.2005).
Washington’s failure to object at trial to claims he now raises on appeal will not preclude our review of those issues under the plain-error rule, but the failure to object will weigh against any claim of error. Irvin v. State, 940 So.2d 331, 341 (Ala.Crim.App.2005).
Washington filed a pretrial motion to suppress statements he made to several people, including Det. Bristow and Birmingham police officer Pinkney Tooson because, Washington alleged, those statements were made while he was in custody but had not received Miranda warnings. The trial court held a hearing on the motion. The court denied the motion as to statements Washington made to Det. Bris-tow before he was in custody and one spontaneous statement he made to Officer Tooson while he was in custody. The court granted the motion as to the second statement Washington made to Officer Tooson while Washington was in custody.
Washington now argues that the trial court should have excluded testimony from Michael Dixon and April Eatmon because it was only from that statement that Det. Bristow learned of Michael Dixon and ultimately of April Eatmon. Specifically, he argues that the testimony and statements of Dixon and Eatmon were fruits of the suppressed conversation and should also have been suppressed. He cites Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), as support. We have reviewed the newly raised claim for plain error, and we find no plain error.
First, we note that the State argues that Det. Bristow had had contact with Michael Dixon and April Eatmon before Washington told Officer Tooson about his involvement in the robbery-murder. Thus, the State contends, statements and testimony from Dixon and Eatmon would have been admissible under the inevitable-discovery rule enunciated in Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Although it appears from the record that the witnesses were discovered independently of the information provided by Officer Tooson, we need not make a specific finding because the “fruit of the poisonous tree” doctrine has no application to this issue.
The United States Supreme Court addressed this precise issue in Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). In that case, the Court framed the issue as follows:
“This case presents the question whether the testimony of a witness in respondent’s state court trial for rape must be excluded simply because police had learned the identity of the witness by questioning respondent at a time when he was in custody as a suspect, but had not been advised that counsel would be appointed for him if he was indigent.”
The Court analyzed the legal principles and caselaw preceding Miranda, it discussed the Miranda decision and the procedural safeguards or Miranda rules, and it then stated:
“The [Miranda ] Court recognized that these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected. As the Court remarked:
“ ‘(W)e cannot say that the Constitution necessarily requires adherence to any particular solution for the inher *430 ent compulsions of the interrogation process as it is presently conducted.’
“[Miranda v. Arizona, 384 U.S at 467].
“The suggested safeguards were not intended to 'create a constitutional straightjacket,’ ibid., but rather to provide practical reinforcement for the right against compulsory self-incrimination.”
417 U.S. at 444, 94 S.Ct. 2357.
The Court determined that, although the police had not informed Tucker of the complete list of Miranda rights, his statement had not been coerced nor was it involuntary, and the police conduct did not deprive him of his right to be free from compulsory self-incrimination. The Court further stated:
“Our determination that the interrogation in this case involved no compulsion sufficient to breach the right against compulsory self-incrimination does not mean there was not a disregard, albeit an inadvertent disregard, of the procedural rules later established in Miranda. The question for decision is how sweeping the judicially imposed consequences of this disregard shall be. This Court said in Miranda that statements taken in violation of the Miranda principles must not be used to prove the prosecution’s case at trial. That requirement was fully complied with by the state court here: respondent’s statements, claiming that he was with Henderson and then asleep during the time period of the crime were not admitted against him at trial. This Court has also said, in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), that the ‘fruits’ of police conduct which actually infringed a defendant’s Fourth Amendment rights must be suppressed. But we have already concluded that the police conduct at issue here did not abridge respondent’s constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in Miranda to safeguard that privilege. Thus, in deciding whether Henderson’s testimony must be excluded, there is no controlling precedent of this Court to guide us. We must therefore examine the matter as a question of principle.”
417 U.S. at 445-46, 94 S.Ct. 2357 (footnote omitted).
After analyzing the various principles and rationales regarding exclusion or admission of the testimony of the witness whose name was revealed during Tucker’s statement to the police, the Court determined:
“In summary, we do not think that any single reason supporting exclusion of this witness’ testimony, or all of them together, are very persuasive. By contrast, we find the arguments in favor of admitting the testimony quite strong. For, when balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce. In this particular case we also ‘must consider society’s interest in the effective prosecution of criminals in light of the protection our pre-Miranda standards afford criminal defendants.’ Jenkins v. Delaware, 395 U.S. 213, 221, 89 S.Ct. 1677, 1681, 23 L.Ed.2d 253 (1969). These interests may be outweighed by the need to provide an effective sanction to a constitutional right, Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), but they must in any event be valued. Here respondent’s own statement, which might have helped the prosecution show respondent’s guilty conscience *431 at trial, had already been excised from the prosecution’s case.... To extend the excision further under the circumstances of this case and exclude relevant testimony of a third-party witness would require far more persuasive arguments than those advanced by respondent.”
417 U.S. at 450-51, 94 S.Ct. 2357 (footnote omitted).
The United States Supreme Court recently reaffirmed this holding. “Our decision not to apply [Wong Sun v. United States, 871 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] to mere failures to give Miranda warnings was sound at the time [Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) and Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), ] were decided, and we decline to apply Wong Sun to such failures now.” United States v. Patane, 542 U.S. 630, 643, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).
Based on the foregoing, we find that no plain error occurred when the trial court permitted testimony from Michael Dixon and April Eatmon, nor when it permitted testimony about the statements they made to law-enforcement officers. Any violation of Miranda that occurred when Officer Tooson spoke to Washington while Washington was in custody was fully remedied by the exclusion of Officer Tooson’s testimony about the statement. The trial court had no basis for excluding any additional testimony. Washington is not entitled to any relief on this claim.
II.
Washington next argues that the trial court erred to reversal when it permitted the testimony of Verrick Taylor because, he argues, Taylor had a professional relationship with Washington and because the conversation between Taylor and him was privileged. He cites Rule 503A, Ala. R. Evid., in support of his claim. We disagree.
Prior to trial, Washington moved to suppress Taylor’s testimony because he had had a professional counseling relationship with Washington in the years before the murder. (C. 152.) At the suppression hearing before trial, Taylor testified that he was not a licensed professional counsel- or and that he had not been certified by the Alabama Board of Examiners in counseling. He said that he first became acquainted with Washington in 2000 when Washington was a resident at a group home where Taylor was employed; he acted as Washington’s case manager. Taylor left the group home and worked as a case manager at Seraaj Family Homes, which he described as a foster-care agency. Washington was placed into a foster home, and Taylor continued to act as his case manager. While he was employed at Se-raaj, Taylor said, he did not “do therapy” because did not have the education to do so. Taylor left Seraaj in April 2003, and that was the last time he spoke with Washington in any capacity associated with his profession. After Taylor left Seraaj, Washington contacted Taylor a few times and they interacted only as friends, Taylor said. (R. 93.) Washington contacted Taylor after the murder and told him of his involvement in the crime. Taylor testified that he did not consider the conversation to be part of a client-counselor relationship. The trial court denied that portion of Washington’s motion to suppress and allowed Taylor to testify at trial.
On appeal, Washington again argues that Taylor’s testimony should have been excluded because it was protected by Rule 503A, Ala. R. Evid. The State argues that this issue should be reviewed only for plain error because it was not raised at trial. As discussed above, however, the record *432 discloses that the issue was raised in the motion to suppress, that Taylor testified at the hearing on the motion to suppress, and that the trial court ruled that the testimony would be permitted (R. 100). Thus the issue was preserved for our review.
The facts regarding this issue were not in conflict, and the trial court applied the law to the undisputed facts. We review de novo the trial court’s ruling on the motion to suppress. State v. Hill, 690 So.2d 1201, 1203-04 (Ala.1996).
Rule 50BA establishes a counselor-client privilege, which allows a client to prevent anyone from disclosing “a confidential communication made for the purpose of facilitating the rendition of counseling services to the client.” Rule 503A(b), Ala. R. Evid. Rule 503A(a) defines “counselor,” “counseling,” and “confidential communication,” and limits the scope of the privilege to communications between a client and a person licensed to provide counseling services that are “made in the furtherance of the rendition of professional counseling services.” The testimony at the suppression hearing clearly revealed that Taylor was not a licensed counselor, that Washington was not Taylor’s client when they spoke about the murder, and that the conversation was not made as part of a counseling relationship. Washington’s statement to Taylor satisfied none of the requirements to warrant exclusion as a privileged communication. Therefore, the trial court did not err when it denied Washington’s motion to suppress Taylor’s testimony on the grounds of privilege. See Baird v. State, 849 So.2d 223, 245 (Ala.Crim.App.2002).
III.
Washington next appears to argue that trial counsel’s performance at the sentencing hearing before the jury was deficient. This claim was not raised in the trial court and is therefore subject to review only for plain error. Washington cites no caselaw in support of his claim; he argues simply that if counsel had put forth “minimal effort” to convince the jury that he was a victim of a deprived childhood, the jury might have recommended that he be sentenced to life imprisonment without parole instead of death.
It is well-settled that, to be entitled to relief on a claim of ineffective assistance of counsel, a defendant must establish both that counsel’s performance was deficient and that the defendant suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If either prong of the Strickland test is lacking, then the defendant is not entitled to relief on the claim. 466 U.S. at 697,104 S.Ct. 2052.
Because Washington did not raise this issue in a motion for a new trial or present any evidence by way of documents, affidavits, or testimony in the trial court, the record now before us contains nothing on which this Court can hold that trial counsel’s performance at the penalty phase was deficient or that Washington suffered any prejudice. See, e.g., Williams v. State, 795 So.2d 753, 784 (Ala.Crim.App.1999) (reviewing claim of ineffective assistance of counsel and finding no plain error in the record). Therefore, having reviewed this claim for plain error and finding no citations in the brief or evidentiary support in the record for the claim, we are compelled to hold that no plain error occurred and that Washington is not entitled to any relief on this claim.
IV.
In his final issue on appeal, Washington argues that the trial court erred when it sentenced him without the benefit of a presentence investigation and report. *433 At the sentencing hearing, the trial court stated that it had received a copy of the report prepared by the Alabama Board of Pardons and Paroles when Washington sought consideration as a youthful offender instead of a presentence report, and it relied on that report at sentencing without objection from Washington. Thus, we review the claim for plain error.
The record reflects that, on January 13, 2006, at the conclusion of the penalty phase of the jury trial, the court ordered that a presentence investigation be completed. (C. 22.) When the final sentencing hearing was held before the trial court, defense counsel noted at the outset that a presentence report had not been completed and that- the report from the youthful-offender investigation had been submitted instead. The court stated for the record that the youthful-offender report would be used as the presentence report. The court stated, “The probation office wanted to handle it that way,” and “[I]t has been prepared for purposes of this sentencing and if there are any corrections to the report that either side would like to point out you are welcome to do so.” (R. 914-15.) Defense counsel confirmed with the court that the report was the same one that had been submitted during the Washington’s application for youthful-offender status, and stated that he had no corrections to the report. (R. 915.) Washington now argues that the information submitted in a youthful-offender report “is far different” from the information submitted in a presentence report. He does not list or discuss any specific evidence that he contends was available after trial that was not gathered or was not available when the youthful-offender investigation was conducted, and he failed to present any such evidence to the trial court either at sentencing or in a motion for a new trial.
The statute governing sentencing in capital-murder cases provides, in relevant part:
“Before making the sentence determination, the trial court shall order and receive a written presentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court.”
§ 13A-5-47(b), Ala.Code 1975 (emphasis added).
Rule 26.3(b), Ala. R.Crim. P., prescribes the content of a presentence report, as follows:
“The presentence report may contain:
“(1) A statement of the offense and the circumstances surrounding it;
“(2) A statement of the defendant’s prior criminal and juvenile record, if any;
“(3) A statement of the defendant’s educational background;
“(4) A statement of the defendant’s employment background, financial condition, and military record, if any;
“(5) A statement of the defendant’s social history, including family relationships, marital status, interests, and activities, residence history, and religious affiliations;
“(6) A statement of the defendant’s medical and psychological history, if available;
“(7) Victim Impact Statements; and
“(8) Any other information required by the court.”
The Committee Comments to Rule 26.3 state, “Generally, a presentence report should be prepared only after the determination of guilt, so as to avoid, insofar as possible, placing the defendant in a position where the defendant is expected to disclose to the probation officer facts about *434 the offense that are not being disclosed at trial.”
We have found no Alabama case presenting the circumstances now before us. However, two cases with similar facts are instructive. In Nelson v. State, 681 So.2d 252, 256 (Ala.Crim.App.1995), a capital-murder case, a presentence report was not submitted to the trial court during the final sentencing hearing before the trial court.[1] In conducting our plain-error review of the record, we stated:
“[T]he sentencing proceeding before the trial court fails to meet the requirements of § 13A-5-47. First, the trial court did not order and receive a written presentence report as required by § 13A-5-47(b). This requirement is mandatory in a case in which the death penalty has been imposed and cannot be waived.”
Nelson v. State, 681 So.2d 252, 256 (Ala.Crim.App.l995)(emphasis added), aff'd on return to remand, 681 So.2d 257 (Ala.Crim.App.1996), aff'd, 681 So.2d 260 (Ala.1996). This Court remanded the case and ordered the trial court to conduct another sentencing hearing that complied with the statute.
In Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), a presentence report was provided to the court, but in conducting our plain-error review of the case, we expressed our concern about the “perfunctory nature” of the report. Specifically, we noted that some of the information appeared to have been taken from an interview with Guthrie years earlier and that little effort had been made to obtain more information about Guthrie and his status at the time of sentencing. We held:
“This presentence report’s cursory and incomplete treatment of Guthrie troubles us, because it may have hamstrung the trial court’s consideration of the full mosaic of Guthrie’s background and circumstances before determining the proper sentence. As such, this pre-sentence report risked foiling the purpose of § 13A-5-47(b). We find that the insufficiency of this report requires a remand for the trial court to reconsider Guthrie’s sentence with a sufficient pre-sentence report.”
Guthrie v. State, 689 So.2d at 947, aff'd on return to remand, 689 So.2d 948 (Ala.Crim.App.), aff'd, 689 So.2d 951 (Ala.1997).
The case before us is not on point with Nelson because the trial court here had before it a youthful offender report that the court considered as a presentence report, and it is not on point with Guthrie because it appears that the presentence report in Guthrie’s case contained more glaring inadequacies than did the report in this case. However, from a consideration of those two cases, along with § 13A-5-47, Ala.Code 1975, and Rule 26.3, Ala. R.Crim. P., we are compelled to find that the trial court committed plain error when it proceeded to sentencing without a current presentence report. A presentence report is mandatory, according to § 13A-5-47, and it cannot be waived. It appears from the record that, even though the trial court ordered a presentence report, the probation office decided to resubmit the youthful-offender report instead, because it “wanted to handle it that way.” (R. 914.) The decision was not for the probation office to make, in light of existing Alabama law, and the trial court should not have accepted the youthful-offender report as a *435 substitute for the mandatory presentence investigation and report.
We note that the youthful-offender report is thorough and that it contains information about most of the categories listed in Rule 26.3, Ala. R.Crim. P. (C. 54-59.) The report, however, was completed on June 16, 2005, 9 months before Washington was sentenced, and 6 months before the trial was held. The report does not contain victim-impact statements, and it contains no updated information about Washington’s health, psychological status, or his adjustment to incarceration. Furthermore, it appears that Washington was not contacted for any statements or updates on this information after the trial, nor was he permitted to make any additional statements about the crime or his involvement in it. As noted in the Committee Comments to Rule 26, the presen-tence report should have been prepared only after trial so that Washington was not expected to disclose to the probation officer the facts of the crime before he went to trial.
We recognize that an argument can be made that the absence of a presentence report in this case should be considered harmless error because the youthful-offender report was fairly thorough and because defense counsel did not object to the absence of a presentence report. However, because Alabama caselaw and the relevant statute clearly provide that a presentence report is mandatory, because a presentence report was ordered by the court, and because this is a capital-murder case in which the death penalty has been imposed and this case will therefore undergo many levels of review, we believe that justice will better be served by remanding this case now so that this error can be corrected.
Therefore, just as this Court did in Nelson, we now direct:
“For the above reasons, we remand this case to the trial court with instructions that it conduct another sentencing hearing and strictly follow the appropriate statutory requirements. At this hearing, the appellant should be allowed to respond to the presentence report and to present any evidence about any part of the report as to which there is a factual dispute. The presentence report should contain all relevant information prescribed by law or court rule in felony cases and should include all information pertaining to the appellant that would be relevant to the determination of sentence, including current information up to the date of sentencing. Of course, the appellant ... should be present during the proceedings. The trial court is instructed to take all action necessary to permit the clerk of the circuit court to file with this court a return -within [70] days from the release of this opinion. The return should include the sentencing order of the trial court and a transcript of the hearing proceedings.”
Nelson v. State, 681 So.2d at 257.
Upon return to remand, this Court will conduct the mandatory plain-error review of the proceedings.[2]
REMANDED WITH INSTRUCTIONS.
McMILLAN, PH., and BASCHAB, SHAW, and WISE, JJ„ concur.

*436
On Return to Remand

WELCH, Judge.
On January 12, 2007, this Court affirmed Brandon Washington’s conviction for murder made capital because it occurred during the course of a robbery, a violation of § 13A-5-40(a)(2), Ala.Code 1975. We remanded the cause to the circuit court, however, for the probation office to prepare a proper presentence report as ordered by the circuit court and for the trial court to conduct a second sentencing hearing in light of the presentence report.
I.
The probation office and the circuit court have complied with this Court’s directions. At the second sentencing hearing, Washington’s counsel stated that in his opinion, the presentence report was “almost worthless.” (Supp. R., p. 4.) We agree with defense counsel that the report is not the most thorough presentence report to come before us; however, as the trial court pointed out at the hearing, it complied with Rule 26.3, Ala. R.Crim. P., and with § 13A-5-47, Ala.Code 1975. (Supp. R., p. 6.)
Furthermore, the trial court allowed Washington the opportunity to testify at the second sentencing hearing to advise the court of any information that was not included in the presentence report but that he believed would be relevant in determining the sentence. For example, Washington was able to testify as to his time in foster care, as well as the to the counseling he received while in foster care.
In reviewing the record on return to remand, we conclude that the trial court had the benefit of a proper presentence report when sentencing Washington and that this Court’s directions in its original opinion have been met.
After considering the presentence report and the evidence presented at both the trial and the second sentencing hearing, the trial court entered an order sentencing Washington to death. Because this case involves the imposition of the death penalty, this court is required to review the record for plain error, pursuant to Rule 45A, Ala. R.App. P.
II.
In our original opinion, we pretermitted any discussion as to whether the record on appeal revealed any error. On return to remand, in compliance with Rule 45A, Ala. R.App. P., we have reviewed the record for any plain error with respect to either the guilt phase of Washington’s trial, after which he was convicted of capital murder, or the penalty phase of his trial, after which the jury recommended by a vote of 11 to 1 that he be sentenced to death.
In reviewing the trial court’s charge to the jury during the penalty phase of Washington’s trial, we find that the court gave a misleading, if not erroneous, charge regarding the weighing of the aggravating circumstances against the mitigating circumstances.
At the outset of its instructions to the jury, the trial court told jurors that the issue before them during the penalty phase was whether the aggravating circumstances outweighed the mitigating circumstances, “or do the mitigating circumstances outweigh the aggravating circumstance.” (R. 894.) During the course of its instructions regarding the requirement that jurors weigh the aggravating circumstances that were proven against the mitigating circumstances in determining whether to recommend the death sentence or a sentence of life in prison without the possibility of parole, the trial court instructed the jury as follows:
*437 “If after a full and fair consideration of all the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, and that the aggravating circumstance outweighs the mitigating circumstances, your verdict would be, We the jury find that the Defendant, Brandon Washington, be punished by death. The vote is as follows .... ’
“On the other hand, if after a full and fair consideration of all the evidence in the case, you determine that the mitigating circumstances outweigh the aggravating circumstances, your verdict would be to set punishment of life imprisonment without parole.... ”
(R. 908.)
This instruction improperly states that the jury had to find that the mitigating circumstances outweighed the aggravating circumstances before it could return a verdict recommending a sentence of life in prison without the possibility of parole. It does not provide any guidance to jurors regarding what the verdict should be if they find that the mitigating circumstances and the aggravating circumstances are of equal weight.
Washington did not object to these instructions, and on appeal, he does not contend that the instructions as set forth above constituted error. Therefore, we review these instructions for plain error, that is, an error that “ ‘ “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” ’ ” Ex parte Davis, 718 So.2d 1166, 1174 (Ala.1998), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), quoting in turn United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.1986).
Alabama’s death-penalty statutory scheme provides that “[i]f the jury determines that one or more aggravating circumstances as defined by Section 13A-5-49 exist but do not outweigh the mitigating circumstances, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole.” § 13A-5-46(e)(2), Ala. Code 1975 (emphasis added). By providing that if the aggravating circumstances do not outweigh the mitigating circumstances, the statute encompasses those situations in which the aggravating circumstances and the mitigating circumstances are equal.
The trial court’s instruction to the jury in this case, however, stated that a verdict recommending a punishment of life imprisonment without the possibility of parole would be appropriate only if the mitigating circumstances outweighed the aggravating circumstances. The instructions did not provide the jury with any guidance as to the proper verdict if it found that the aggravating circumstances and the mitigating circumstances balanced one another.
The Alabama Supreme Court addressed this issue in Ex parte McNabb, 887 So.2d 998 (Ala.2004). In that case, the trial court instructed the jury as follows during the sentencing phase of the trial:
“ ‘[I]f, after a full and fair consideration of all of the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstances, then your verdict would be: ‘We, the jury, recommend that the defendant be punished by death, and the vote is as follows ....” However, if after a full and fair consideration of all of the evidence in this case, you determine that the mitigating circumstances outweigh any aggravating circumstance or circumstances that exist, or you are not convinced beyond a reasonable doubt that at least *438 one aggravating circumstance does exist, your verdict should be to recommend the punishment of life imprisonment without parole
McNabb, 887 So.2d at 1001. Thus, just as in this case, the language used in instructing the jury in McNabb did not specifically instruct the jury on what to do if the aggravating circumstances and mitigating circumstances were in balance.
The Alabama Supreme Court held that although the trial court did not instruct the jury as to what to do when the mitigating circumstances and the aggravating circumstances were in balance, “the jury was not invited to recommend a sentence of death without finding any aggravating circumstance.” McNabb 887 So.2d at 1004. The Supreme Court then held that, in considering the jury charge in its entirety, it could not conclude that “the error ‘seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,’ Ex parte Davis, 718 So.2d [1166] at 1173-74 [ (Ala.1998) ], so as to require a reversal of the sentence.” McNabb, 887 So.2d at 1004.
After reviewing the trial court’s charge to the jury during the penalty phase in this case, we likewise cannot conclude that the trial court’s failure to instruct the jury on what to do if the aggravating circumstances and the mitigating circumstances were balanced seriously affected the fairness, integrity, or public reputation of this trial. When charging the jury regarding mitigating circumstances and the weight to be given to them, the court should reiterate that the aggravating circumstances must outweigh the mitigating circumstances in order for a juror to vote to return a verdict recommending death, and that if the aggravating circumstances do not outweigh the mitigating circumstances, which would encompass a situation in which the aggravating circumstances are equal to the mitigating circumstances, then a vote recommending life imprisonment without parole would be appropriate. This would make clear to the jury that, in those instances when the mitigating circumstances and the aggravating circumstances are equal, a verdict recommending the death penalty would not be appropriate.
We have searched the record for any error that may have adversely affected Washington’s substantial rights and have found none. Therefore, we find no basis for reversal under the plain-error standard of review as to either the guilt or penalty phases of Washington’s trial. See Rule 45A, Ala. R.App. P.
III.
Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Washington’s conviction and sentence of death. Section 13A-5-53, Ala.Code 1975, requires that we review the propriety of Washington’s death sentence to determine whether any error adversely affecting his rights occurred in the sentence proceedings; whether the trial court’s findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and whether death is the appropriate sentence in the case. In determining whether death is the proper sentence, we must determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After evidence was presented to the jury during the penalty phase of Washington’s *439 trial, the jury, by a vote of 11 to 1, recommended that Washington be sentenced to death.
Pursuant to § 13A-5-47, Ala.Code 1975, the trial court held a subsequent sentencing hearing to aid it in determining whether it would sentence Washington to death or to life imprisonment. In its sentencing order on return to remand, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any nonstatutory mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Washington’s participation in it.
In its findings, the trial court found the existence of one statutory aggravating circumstance, i.e., that Washington had murdered Justin Campbell while Washington was engaged in the commission of a robbery.
The trial court found the following statutory mitigating circumstances existed in this case: (1) that Washington had no significant history of prior criminal activity; and (2) Washington’s age at the time the offense was committed. The court specifically noted that Washington was 18 years old and a student at Miles College at the time of the offense.
The trial court did not find any nonstat-utory mitigating circumstances. The record shows that during the penalty phase of the trial, Washington elicited testimony from only three people in mitigation of the death sentence: his grandmother, his aunt, and his sister. His grandmother stated that Washington had been in foster care because his mother “got strung out on drugs” (R. 879), but she gave no testimony regarding any problems Washington may have experienced while in foster care. In fact, she said that Washington “graduated ahead of his class” in high school. (R. 880.) The gist of the testimony from Washington’s other two witnesses was a plea to spare his life. The record shows that during the penalty phase of the trial, there was no testimony regarding any good works Washington may have done, no school records were introduced, no mental-health or foster-care records were introduced, and evidence regarding his family history was scant at best. In other words, Washington failed to present any evidence that could be considered mitigating.
At the sentencing hearing on remand, Washington’s counsel stated that he disagreed with the conclusions indicated in the presentence report that Washington had no mental disability and that there was no psychological report on Washington. However, he made no effort to introduce a psychological report. Washington himself testified that when he was younger, he was in “therapeutic” foster home because, he said, he was found to have “mental health issues.” (Supp. R., p. 9.) He denied knowing what those issues were, however, saying that his social workers and therapists would not tell him.
After Washington’s attorney, who had been appointed after the trial of this case, elicited testimony that Washington had made the attorney aware of the existence of mental-health issues only days before, the trial court told the attorney that, although it was aware that present counsel had not represented Washington at trial, one of Washington’s “therapists” had testified, and the fact that Washington had been in foster care had been elicited through the testimony of Washington’s grandmother during the penalty phase of the trial. The testimony of these witnesses, however, seemed to cut against any claim that Washington had mental-health *440 issues as a result of his time in foster care that should be considered as a mitigating circumstance.
The trial court then asked Washington whether he had graduated from Huffman High School in Jefferson County and whether he was a student at Miles College when Justin Campbell was murdered. Washington replied “yes” to both queries.
Section 18A-5-45(g) provides that a defendant in a death case
“shall be allowed to offer any mitigating circumstance defined in § 13A-5-51 [statutory] and § 13A-5-52 [nonstatuto-ry]. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.”
In its sentencing order on return to remand, the court specifically found as follows with regard to nonstatutory mitigating circumstances, as provided by § 13A-5-52, Ala.Code 1975:
“In regard to the overall mitigating circumstance set forth in § 13A-5-52, the Court finds nothing from the proceedings conducted before this court or contained in the Youthful Offender Report and Pre-Sentence Report prepared post conviction in this case and made part of the record at the resentencing hearing to suggest a basis for § 13A-5-52 mitigation.”
(Supp. R., p. 40.)
Although Washington interjected the issue of his mental health at the resentenc-ing hearing, the evidence presented in the record as a whole supports the trial court’s determination that no nonstatutory mitigating circumstances existed. We also note that in its discussion of the statutory mitigating circumstances, the trial court specifically found that Washington was not laboring under the influence of an extreme mental or emotional disturbance at the time of Campbell’s murder and, further, that Washington was not suffering from a diminished capacity so as to be unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
In determining that no nonstatutory mitigating circumstances existed, the trial court stated that it considered all the testimony and documentary evidence presented and found no basis for finding a non-statutory mitigating circumstance. After an independent review of the record, we agree with the trial court that there was no factual basis for a finding of a nonstatu-tory mitigating circumstance in this case.
The trial court’s sentencing order reflects that after considering the jury’s advisory verdict and after weighing the aggravating circumstance against the mitigating circumstances, the trial court found that the aggravating circumstance outweighed the mitigating circumstances. Accordingly, the trial court sentenced Washington to death.
Washington was convicted of murder made capital because it occurred during the course of a robbery, a violation of § 13A-5-40(a)(2), Ala.Code 1975.
The evidence adduced at trial showed that Washington, who had been fired from his job as a sales associate at a Radio Shack electronics store days before the incident made the basis of this prosecution, returned to the Radio Shack store on Huffman Road just before closing on Sunday, January 16, 2005. Justin Campbell usually worked at a different location, but he had been assigned to work as the assistant manager of the Huffman Road store on that day.
*441 Washington forced Campbell into a back room and made him he down. The evidence indicated that Campbell pleaded for his life, but Washington shot him in the back of the head from a distance of two to three feet. Police determined that Campbell’s wallet and money from the store were missing.
Washington told at least three people of Campbell’s murder and the robbery.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975. Furthermore, after weighing independently the aggravating circumstance and the mitigating circumstances, this Court finds that the aggravating circumstance outweighs the mitigating circumstance, and we are convinced that death was the appropriate punishment in this case.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Washington’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Washington was convicted of murder made capital because it was committed during the course of a robbery. His sentence was not disproportionate or excessive when compared to penalties imposed in similar cases. See Sneed v. State, 1 So.2d 104 (Ala.Crim.App.2007); Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997); and Peoples v. State, 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987).
For the reasons set forth above, Washington’s conviction and sentence of death are affirmed.
AFFIRMED.
McMILLAN and WISE, JJ., concur.
BASCHAB, P.J., and SHAW, J., concur in the result.

. We note that Nelson represented himself at the sentencing hearing; he did not present any evidence in mitigation, and he asked the trial court to sentence him to death. Nelson v. State, 681 So.2d at 255.

. We note that the trial court in its sentencing order incorrectly stated that Justin Campbell was 18 years old when he was murdered. The testimony reflects that he was 8 days away from his 21st birthday. (R. 337.)