# UNITED STATES *v.* PATANE

No. 02–1183.   Argued December 9, 2003—Decided June 28, 2004

632

*Deputy Solicitor General Dreeben* argued the cause for petitioner. With him on the briefs were *Solicitor General Olson, Acting Assistant Attorney General Wray, James A. Feldman,* and *Joseph C. Wyderko.*

*Jill M. Wichlens* argued the cause for respondent. With her on the brief were *Michael G. Katz* and *Virginia L. Grady.**

JUSTICE THOMAS announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and JUSTICE SCALIA join.

In this case we must decide whether a failure to give a suspect the warnings prescribed by *Miranda* v. *Arizona,*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *William H. Pryor, Jr.,* Attorney General of Alabama, *Nathan A. Forrester,* Solicitor General, *Michael B. Billingsley,* Deputy Solicitor General, *Marc A. Starrett,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *M. Jane Brady* of Delaware, *Charles J. Crist, Jr.,* of Florida, *Mark J. Bennett* of Hawaii, *Lisa Madigan* of Illinois, *Steve Carter* of Indiana, *Mike McGrath* of Montana, *Jim Petro* of Ohio, *D. Michael Fisher* of Pennsylvania, *Lawrence E. Long* of South Dakota, *Paul G. Summers* of Tennessee, *Greg Abbott* of Texas, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Jerry W. Kilgore* of Virginia, *Peggy A. Lautenschlager* of Wisconsin, and *Patrick J. Crank* of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

Briefs of *amici curiae* urging affirmance were filed for the Brennan Center for Justice by *Stephen J. Schulhofer, Frederick A. O. Schwarz, Jr., Tom Gerety,* and *E. Joshua Rosenkranz;* and for the National Association of Criminal Defense Lawyers et al. by *James J. Tomkovicz, David M. Porter,* and *Steven R. Shapiro.*

384 U. S. 436 (1966), requires suppression of the physical fruits of the suspect's unwarned but voluntary statements. The Court has previously addressed this question but has not reached a definitive conclusion. See *Massachusetts* v. *White,* 439 U. S. 280 (1978) *(per curiam)* (dividing evenly on the question); see also *Patterson* v. *United States,* 485 U. S. 922 (1988) (White, J., dissenting from denial of .certiorari). Although we believe that the Court's decisions in *Oregon* v. *Elstad,* 470 U. S. 298 (1985), and *Michigan* v. *Tucker,* 417 U. S. 433 (1974), are instructive, the Courts of Appeals have split on the question after our decision in *Dickerson* v. *United States,* 530 U. S. 428 (2000). See, *e. g., United States* v. *Villalba-Alvarado,* 345 F. 3d 1007 (CA8 2003) (holding admissible the physical fruits of a *Miranda* violation); *United States* v. *Sterling,* 283 F. 3d 216 (CA4 2002) (same); *United States* v. *DeSumma,* 272 F. 3d 176 (CA3 2001) (same); *United States* v. *Faulkingham,* 295 F. 3d 85 (CA1 2002) (holding admissible the physical fruits of a negligent *Miranda* violation). Because the *Miranda* rule protects against violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements, we answer the question presented in the negative.

I

In June 2001, respondent, Samuel Francis Patane, was arrested for harassing his ex-girlfriend, Linda O'Donnell. He was released on bond, subject to a temporary restraining order that prohibited him from contacting O'Donnell. Respondent apparently violated the restraining order by attempting to telephone O'Donnell. On June 6, 2001, Officer Tracy Fox of the Colorado Springs Police Department began to investigate the matter. On the same day, a county probation officer informed an agent of the Bureau of Alcohol, Tobacco and Firearms (ATF), that respondent, a convicted felon, illegally possessed a .40 Glock pistol. The ATF relayed this information to Detective Josh Benner, who worked

closely with the ATF. Together, Detective Benner and Officer Fox proceeded to respondent's residence.

After reaching the residence and inquiring into respondent's attempts to contact O'Donnell, Officer Fox arrested respondent for violating the restraining order. Detective Benner attempted to advise respondent of his *Miranda* rights but got no further than the right to remain silent. At that point, respondent interrupted, asserting that he knew his rights, and neither officer attempted to complete the warning.[1] App. 40.

Detective Benner then asked respondent about the Glock. Respondent was initially reluctant to discuss the matter, stating: "I am not sure I should tell you anything about the Glock because I don't want you to take it away from me." *Id.*, at 41. Detective Benner persisted, and respondent told him that the pistol was in his bedroom. Respondent then gave Detective Benner permission to retrieve the pistol. Detective Benner found the pistol and seized it.

A grand jury indicted respondent for possession of a firearm by a convicted felon, in violation of 18 U. S. C. § 922(g)(1). The District Court granted respondent's motion to suppress the firearm, reasoning that the officers lacked probable cause to arrest respondent for violating the restraining order. It therefore declined to rule on respondent's alternative argument that the gun should be suppressed as the fruit of an unwarned statement.

The Court of Appeals reversed the District Court's ruling with respect to probable cause but affirmed the suppression order on respondent's alternative theory. The court rejected the Government's argument that this Court's decisions in *Elstad, supra,* and *Tucker, supra,* foreclosed application of the fruit of the poisonous tree doctrine of *Wong Sun*

---

[1] The Government concedes that respondent's answers to subsequent on-the-scene questioning are inadmissible at trial under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), despite the partial warning and respondent's assertions that he knew his rights.

v. *United States,* 371 U. S. 471 (1963), to the present context. 304 F. 3d 1013, 1019 (CA10 2002). These holdings were, the Court of Appeals reasoned, based on the view that *Miranda* announced a prophylactic rule, a position that it found to be incompatible with this Court's decision in *Dickerson, supra,* at 444 ("*Miranda* announced a constitutional rule that Congress may not supersede legislatively").[2] The Court of Appeals thus equated *Dickerson's* announcement that *Miranda* is a constitutional rule with the proposition that a failure to warn pursuant to *Miranda* is itself a violation of the Constitution (and, more particularly, of the suspect's Fifth Amendment rights). Based on its understanding of *Dickerson,* the Court of Appeals rejected the post-*Dickerson* views of the Third and Fourth Circuits that the fruits doctrine does not apply to *Miranda* violations. 304 F. 3d, at 1023–1027 (discussing *United States* v. *Sterling,* 283 F. 3d 216 (CA4 2002), and *United States* v. *DeSumma,* 272 F. 3d 176 (CA3 2001)). It also disagreed with the First Circuit's conclusion that suppression is not generally required in the case of negligent failures to warn, 304 F. 3d, at 1027–1029 (discussing *United States* v. *Faulkingham,* 295 F. 3d 85 (CA1 2002)), explaining that "[d]eterrence is necessary not merely to deter intentional wrongdoing, but also to ensure that officers diligently (non-negligently) protect—and properly are trained to protect—the constitutional rights of citizens," 304 F. 3d, at 1028–1029. We granted certiorari. 538 U. S. 976 (2003).

As we explain below, the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this con-

---

[2] The Court of Appeals also distinguished *Oregon* v. *Elstad,* 470 U. S. 298 (1985), on the ground that the second (and warned) confession at issue there was the product of the defendant's volition. 304 F. 3d, at 1019, 1021. For the reasons discussed below, we do not find this distinction relevant.

text. And just as the Self-Incrimination Clause primarily focuses on the criminal trial, so too does the *Miranda* rule. The *Miranda* rule is not a code of police conduct, and police do not violate the Constitution (or even the *Miranda* rule, for that matter) by mere failures to warn. For this reason, the exclusionary rule articulated in cases such as *Wong Sun* does not apply. Accordingly, we reverse the judgment of the Court of Appeals and remand the case for further proceedings.

## II

The Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U. S. Const., Amdt. 5. We need not decide here the precise boundaries of the Clause's protection. For present purposes, it suffices to note that the core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial. See, *e. g., Chavez* v. *Martinez,* 538 U. S. 760, 764–768 (2003) (plurality opinion); *id.,* at 777–779 (SOUTER, J., concurring in judgment); 8 J. Wigmore, Evidence § 2263, p. 378 (J. McNaughton rev. ed. 1961) (explaining that the Clause "was directed at the employment of legal process to *extract from the person's own lips* an admission of guilt, which would thus take the place of other evidence"); see also *United States* v. *Hubbell,* 530 U. S. 27, 49–56 (2000) (THOMAS, J., concurring) (explaining that the privilege might extend to bar the compelled production of any incriminating evidence, testimonial or otherwise). The Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements. See, *e. g., id.,* at 34 (noting that the word "'witness'" in the Self-Incrimination Clause "limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character"); *id.,* at 35 (discussing why compelled blood samples do not violate the Clause; cataloging other examples and citing cases); *Elstad,* 470 U. S., at 304 ("The Fifth Amendment, of

course, is not concerned with nontestimonial evidence"); *id.*, at 306–307 ("The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony"); *Withrow* v. *Williams,* 507 U. S. 680, 705 (1993) (O'CONNOR, J., concurring in part and dissenting in part) (describing "*true* Fifth Amendment claims [as] the extraction and use of *compelled* testimony"); *New York* v. *Quarles,* 467 U. S. 649, 665–672, and n. 4 (1984) (O'CONNOR, J., concurring in judgment in part and dissenting in part) (explaining that the physical fruit of a *Miranda* violation need not be suppressed for these reasons).

To be sure, the Court has recognized and applied several prophylactic rules designed to protect the core privilege against self-incrimination. See, *e. g., Chavez, supra,* at 770–772 (plurality opinion). For example, although the text of the Self-Incrimination Clause at least suggests that "its coverage [is limited to] compelled testimony that is used against the defendant in the trial itself," *Hubbell, supra,* at 37, potential suspects may, at times, assert the privilege in proceedings in which answers might be used to incriminate them in a subsequent criminal case. See, *e. g., United States* v. *Balsys,* 524 U. S. 666, 671–672 (1998); *Minnesota* v. *Murphy,* 465 U. S. 420, 426 (1984); cf. *Kastigar* v. *United States,* 406 U. S. 441 (1972) (holding that the Government may compel grand jury testimony from witnesses over Fifth Amendment objections if the witnesses receive "use and derivative use immunity"); *Uniformed Sanitation Men Assn., Inc.* v. *Commissioner of Sanitation of City of New York,* 392 U. S. 280, 284 (1968) (allowing the Government to use economic compulsion to secure statements but only if the Government grants appropriate immunity). We have explained that "[t]he natural concern which underlies [these] decisions is that an inability to protect the right at one stage of a proceeding may make its invocation useless at a later stage." *Tucker,* 417 U. S., at 440–441.

Similarly, in *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. See *Dickerson*, 530 U. S., at 434–435; *Miranda*, 384 U. S., at 467. To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

But because these prophylactic rules (including the *Miranda* rule) necessarily sweep beyond the actual protections of the Self-Incrimination Clause, see, *e. g., Withrow, supra,* at 690–691; *Elstad, supra,* at 306, any further extension of these rules must be justified by its necessity for the protection of the actual right against compelled self-incrimination, *Chavez, supra,* at 778 (SOUTER, J., concurring in judgment) (requiring a "'powerful showing'" before "expand[ing] . . . the privilege against compelled self-incrimination"). Indeed, at times the Court has declined to extend *Miranda* even where it has perceived a need to protect the privilege against self-incrimination. See, *e. g., Quarles, supra,* at 657 (concluding "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination").

It is for these reasons that statements taken without *Miranda* warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial, see *Elstad, supra,* at 307–308; *Harris* v. *New York*, 401 U. S. 222 (1971), though the fruits of actually compelled testimony cannot, see *New Jersey* v. *Portash*, 440 U. S. 450, 458–459 (1979). More generally, the *Miranda* rule "does not require that the statements [taken without complying with the rule] and their fruits be discarded as inherently tainted," *Elstad*, 470 U. S., at 307. Such a blanket suppression rule could not be justi-

fied by reference to the "Fifth Amendment goal of assuring trustworthy evidence" or by any deterrence rationale, *id.*, at 308; see *Tucker, supra,* at 446–449; *Harris, supra,* at 225–226, and n. 2, and would therefore fail our close-fit requirement.

Furthermore, the Self-Incrimination Clause contains its own exclusionary rule. It provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Amdt. 5. Unlike the Fourth Amendment's bar on unreasonable searches, the Self-Incrimination Clause is self-executing. We have repeatedly explained "that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." *Chavez,* 538 U. S., at 769 (plurality opinion) (citing, for example, *Elstad, supra,* at 307–308). This explicit textual protection supports a strong presumption against expanding the *Miranda* rule any further. Cf. *Graham* v. *Connor,* 490 U. S. 386 (1989).

Finally, nothing in *Dickerson,* including its characterization of *Miranda* as announcing a constitutional rule, 530 U. S., at 444, changes any of these observations. Indeed, in *Dickerson,* the Court specifically noted that the Court's "subsequent cases have reduced the impact of the *Miranda* rule on legitimate law enforcement while reaffirming *[Miranda]*'s core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief." *Id.,* at 443–444. This description of *Miranda,* especially the emphasis on the use of "unwarned statements . . . in the prosecution's case in chief," makes clear our continued focus on the protections of the Self-Incrimination Clause. The Court's reliance on our *Miranda* precedents, including both *Tucker* and *Elstad,* see, *e. g., Dickerson, supra,* at 438, 441, further demonstrates the continuing validity of those decisions. In short, nothing in *Dickerson* calls into question our continued

insistence that the closest possible fit be maintained between the Self-Incrimination Clause and any rule designed to protect it.

## III

Our cases also make clear the related point that a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule. So much was evident in many of our pre-*Dickerson* cases, and we have adhered to this view since *Dickerson*. See *Chavez*, 538 U. S., at 772–773 (plurality opinion) (holding that a failure to read *Miranda* warnings did not violate the respondent's constitutional rights); 538 U. S., at 789 (KENNEDY, J., concurring in part and dissenting in part) (agreeing "that failure to give a *Miranda* warning does not, without more, establish a completed violation when the unwarned interrogation ensues"); *Elstad, supra,* at 308; *Quarles,* 467 U. S., at 654; cf. *Chavez, supra,* at 777–779 (SOUTER, J., concurring in judgment). This, of course, follows from the nature of the right protected by the Self-Incrimination Clause, which the *Miranda* rule, in turn, protects. It is "'a fundamental *trial* right.'" *Withrow,* 507 U. S., at 691 (quoting *United States v. Verdugo-Urquidez,* 494 U. S. 259, 264 (1990)). See also *Chavez,* 538 U. S., at 766–768 (plurality opinion); *id.,* at 790 (KENNEDY, J., concurring in part and dissenting in part) ("The identification of a *Miranda* violation and its consequences, then, ought to be determined at trial").

It follows that police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, "[t]he exclusion of unwarned statements . . . is a complete and sufficient

remedy" for any perceived *Miranda* violation.  *Chavez, supra,* at 790.[3]

Thus, unlike unreasonable searches under the Fourth Amendment or actual violations of the Due Process Clause or the Self-Incrimination Clause, there is, with respect to mere failures to warn, nothing to deter.  There is therefore no reason to apply the "fruit of the poisonous tree" doctrine of *Wong Sun,* 371 U. S., at 488.[4]  See also *Nix* v. *Williams,* 467 U. S. 431, 441 (1984) (discussing the exclusionary rule in the Sixth Amendment context and noting that it applies to "*illegally* obtained evidence [and] other incriminating evidence derived from [it]" (emphasis added)).  It is not for this Court to impose its preferred police practices on either federal law enforcement officials or their state counterparts.

## IV

In the present case, the Court of Appeals, relying on *Dickerson,* wholly adopted the position that the taking of unwarned statements violates a suspect's constitutional rights. 304 F. 3d, at 1028–1029.[5]  And, of course, if this were so, a

---

[3] We acknowledge that there is language in some of the Court's post-*Miranda* decisions that might suggest that the *Miranda* rule operates as a direct constraint on police.  See, *e. g., Stansbury* v. *California,* 511 U. S. 318, 322 (1994) *(per curiam); Moran* v. *Burbine,* 475 U. S. 412, 420 (1986) (stating that "*Miranda* imposed on the police an obligation to follow certain procedures"); cf. *Edwards* v. *Arizona,* 451 U. S. 477, 485 (1981).  But *Miranda* itself made clear that its focus was the admissibility of statements, see, *e. g.,* 384 U. S., at 439, 467, a view the Court reaffirmed in *Dickerson* v. *United States,* 530 U. S. 428, 443–444 (2000) (equating the *Miranda* rule with the proposition that "unwarned statements may not be used *as evidence* in the prosecution's case in chief" (emphasis added)).

[4] We reject respondent's invitation to apply the balancing test of *Nardone* v. *United States,* 308 U. S. 338 (1939).  Brief for Respondent 15–33. At issue in *Nardone* was the violation of a federal wiretap statute, and the Court employed an exclusionary rule to deter those violations.  But, once again, there are no violations (statutory or constitutional) to deter here.

[5] It is worth mentioning that the Court of Appeals did not have the benefit of our decision in *Chavez* v. *Martinez,* 538 U. S. 760 (2003).

strong deterrence-based argument could be made for suppression of the fruits. See, *e. g., Nix, supra,* at 441–444; *Wong Sun, supra,* at 484–486; cf. *Nardone* v. *United States,* 308 U. S. 338, 341 (1939).

But *Dickerson*'s characterization of *Miranda* as a constitutional rule does not lessen the need to maintain the closest possible fit between the Self-Incrimination Clause and any judge-made rule designed to protect it. And there is no such fit here. Introduction of the nontestimonial fruit of a voluntary statement, such as respondent's Glock, does not implicate the Self-Incrimination Clause. The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial. In any case, "[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy" for any perceived *Miranda* violation. *Chavez, supra,* at 790 (KENNEDY, J., concurring in part and dissenting in part). See also H. Friendly, Benchmarks 280–281 (1967). There is simply no need to extend (and therefore no justification for extending) the prophylactic rule of *Miranda* to this context.

Similarly, because police cannot violate the Self-Incrimination Clause by taking unwarned though voluntary statements, an exclusionary rule cannot be justified by reference to a deterrence effect on law enforcement, as the Court of Appeals believed, 304 F. 3d, at 1028–1029. Our decision not to apply *Wong Sun* to mere failures to give *Miranda* warnings was sound at the time *Tucker* and *Elstad* were decided, and we decline to apply *Wong Sun* to such failures now.

The Court of Appeals ascribed significance to the fact that, in this case, there might be "little [practical] difference between [respondent's] confessional statement" and the actual physical evidence. 304 F. 3d, at 1027. The distinction, the court said, "appears to make little sense as a matter of policy." *Ibid.* But, putting policy aside, we have held that "[t]he word 'witness' in the constitutional text limits the"

scope of the Self-Incrimination Clause to testimonial evidence. *Hubbell,* 530 U. S., at 34–35. The Constitution itself makes the distinction.[6] And although it is true that the Court requires the exclusion of the physical fruit of actually coerced statements, it must be remembered that statements taken without sufficient *Miranda* warnings are presumed to have been coerced only for certain purposes and then only when necessary to protect the privilege against self-incrimination. See Part II, *supra.* For the reasons discussed above, we decline to extend that presumption further.[7]

Accordingly, we reverse the judgment of the Court of Appeals and remand the case for further proceedings.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

In *Oregon* v. *Elstad,* 470 U. S. 298 (1985), *New York* v. *Quarles,* 467 U. S. 649 (1984), and *Harris* v. *New York,* 401 U. S. 222 (1971), evidence obtained following an unwarned interrogation was held admissible. This result was based in large part on our recognition that the concerns underlying the *Miranda* v. *Arizona,* 384 U. S. 436 (1966), rule must be accommodated to other objectives of the criminal justice sys-

---

[6] While Fourth Amendment protections extend to "persons, houses, papers, and effects," the Self-Incrimination Clause prohibits only compelling a defendant to be "a witness against himself," Amdt. 5.

[7] It is not clear whether the Government could have used legal processes actually to compel respondent to produce the Glock, though there is a reasonable argument that it could have. See, *e. g., United States* v. *Hubbell,* 530 U. S. 27, 42–45 (2000); *Baltimore City Dept. of Social Servs.* v. *Bouknight,* 493 U. S. 549, 554–556 (1990); *Fisher* v. *United States,* 425 U. S. 391 (1976); *Warden, Md. Penitentiary* v. *Hayden,* 387 U. S. 294, 302–303 (1967); *Schmerber* v. *California,* 384 U. S. 757, 761 (1966). But see *Commonwealth* v. *Hughes,* 380 Mass. 583, 404 N. E. 2d 1239 (1980); *Goldsmith* v. *Superior Court,* 152 Cal. App. 3d 76, 199 Cal. Rptr. 366 (1984). In light of this, it would be especially odd to exclude the Glock here.

tem. I agree with the plurality that *Dickerson* v. *United States,* 530 U. S. 428 (2000), did not undermine these precedents and, in fact, cited them in support. Here, it is sufficient to note that the Government presents an even stronger case for admitting the evidence obtained as the result of Patane's unwarned statement. Admission of nontestimonial physical fruits (the Glock in this case), even more so than the postwarning statements to the police in *Elstad* and *Michigan* v. *Tucker,* 417 U. S. 433 (1974), does not run the risk of admitting into trial an accused's coerced incriminating statements against himself. In light of the important probative value of reliable physical evidence, it is doubtful that exclusion can be justified by a deterrence rationale sensitive to both law enforcement interests and a suspect's rights during an in-custody interrogation. Unlike the plurality, however, I find it unnecessary to decide whether the detective's failure to give Patane the full *Miranda* warnings should be characterized as a violation of the *Miranda* rule itself, or whether there is "[any]thing to deter" so long as the unwarned statements are not later introduced at trial. *Ante,* at 641–642.

With these observations, I concur in the judgment of the Court.

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

The plurality repeatedly says that the Fifth Amendment does not address the admissibility of nontestimonial evidence, an overstatement that is beside the point. The issue actually presented today is whether courts should apply the fruit of the poisonous tree doctrine lest we create an incentive for the police to omit *Miranda* warnings, see *Miranda* v. *Arizona,* 384 U. S. 436 (1966), before custodial interrogation.[1]

---

[1] In so saying, we are taking the legal issue as it comes to us, even though the facts give off the scent of a made-up case. If there was a *Miranda* failure, the most immediate reason was that Patane told the po-

In closing their eyes to the consequences of giving an evidentiary advantage to those who ignore *Miranda,* the plurality adds an important inducement for interrogators to ignore the rule in that case.

*Miranda* rested on insight into the inherently coercive character of custodial interrogation and the inherently difficult exercise of assessing the voluntariness of any confession resulting from it. Unless the police give the prescribed warnings meant to counter the coercive atmosphere, a custodial confession is inadmissible, there being no need for the previous time-consuming and difficult enquiry into voluntariness. That inducement to forestall involuntary statements and troublesome issues of fact can only atrophy if we turn around and recognize an evidentiary benefit when an unwarned statement leads investigators to tangible evidence. There is, of course, a price for excluding evidence, but the Fifth Amendment is worth a price, and in the absence of a very good reason, the logic of *Miranda* should be followed: a *Miranda* violation raises a presumption of coercion, *Oregon* v. *Elstad,* 470 U. S. 298, 306–307, and n. 1 (1985), and the Fifth Amendment privilege against compelled self-incrimination extends to the exclusion of derivative evidence, see *United States* v. *Hubbell,* 530 U. S. 27, 37–38 (2000) (recognizing "the Fifth Amendment's protection against the prosecutor's use of incriminating information derived directly or indirectly from . . . [actually] compelled testimony"); *Kastigar* v. *United States,* 406 U. S. 441, 453 (1972). That should be the end of this case.

The fact that the books contain some exceptions to the *Miranda* exclusionary rule carries no weight here. In *Harris* v. *New York,* 401 U. S. 222 (1971), it was respect for the integrity of the judicial process that justified the admission

lice to stop giving the warnings because he already knew his rights. There could easily be an analogy in this case to the bumbling mistake the police committed in *Oregon* v. *Elstad,* 470 U. S. 298 (1985). See *Missouri* v. *Seibert, ante,* at 614–615 (plurality opinion).

of unwarned statements as impeachment evidence. But Patane's suppression motion can hardly be described as seeking to "perver[t]" *Miranda* "into a license to use perjury" or otherwise handicap the "traditional truth-testing devices of the adversary process." 401 U. S., at 225–226. Nor is there any suggestion that the officers' failure to warn Patane was justified or mitigated by a public emergency or other exigent circumstance, as in *New York* v. *Quarles,* 467 U. S. 649 (1984). And of course the premise of *Oregon* v. *Elstad, supra,* is not on point; although a failure to give *Miranda* warnings before one individual statement does not necessarily bar the admission of a subsequent statement given after adequate warnings, 470 U. S. 298; cf. *Missouri* v. *Seibert, ante,* at 614–615 (plurality opinion), that rule obviously does not apply to physical evidence seized once and for all.[2]

There is no way to read this case except as an unjustifiable invitation to law enforcement officers to flout *Miranda* when there may be physical evidence to be gained. The incentive is an odd one, coming from the Court on the same day it decides *Missouri* v. *Seibert, ante,* p. 600. I respectfully dissent.

JUSTICE BREYER, dissenting.

For reasons similar to those set forth in JUSTICE SOUTER's dissent and in my concurring opinion in *Missouri* v. *Seibert, ante,* at 617, I would extend to this context the "fruit of the poisonous tree" approach, which I believe the Court has come close to adopting in *Seibert.* Under that approach,

---

[2] To the extent that *Michigan* v. *Tucker,* 417 U. S. 433 (1974) (admitting the testimony of a witness who was discovered because of an unwarned custodial interrogation), created another exception to *Miranda,* it is off the point here. In *Tucker,* we explicitly declined to lay down a broad rule about the fruits of unwarned statements. Instead, we "place[d] our holding on a narrower ground," relying principally on the fact that the interrogation occurred before *Miranda* was decided and was conducted in good faith according to constitutional standards governing at that time. 417 U. S., at 447–448 (citing *Escobedo* v. *Illinois,* 378 U. S. 478 (1964)).

courts would exclude physical evidence derived from unwarned questioning unless the failure to provide *Miranda* v. *Arizona,* 384 U. S. 436 (1966), warnings was in good faith. See *Seibert, ante,* at 617–618 (BREYER, J., concurring); cf. *ante,* at 645–646, n. 1 (SOUTER, J., dissenting). Because the courts below made no explicit finding as to good or bad faith, I would remand for such a determination.