In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2838

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HENRY C. RENKEN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 1099—**David H. Coar**, *Judge.*

ARGUED OCTOBER 18, 2006—DECIDED JANUARY 31, 2007

Before POSNER, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* A jury convicted Henry Renken of bank robbery (and using a firearm while committing the robbery) after concluding that he had held up the NorthSide Community Bank in Gurnee, Illinois, and relieved it of over $18,000 in cash before making his getaway on, of all things, a bicycle. As he fled, the college-educated Renken (he earned a bachelor's degree in biology from Ripon College in Ripon, Wisconsin, in 1976) proclaimed, "You can thank President Bush and the economy for this."

Renken now seeks a new trial, arguing that the district court judge (David H. Coar) should not have admitted certain evidence, including the results of police searches

of his home and vehicle and the testimony of a dog handler who, together with his bloodhound (Daisy Mae),[1] investigated part of the crime scene. We start with the facts.

On a late afternoon in November of 2002, a tall man carrying a duffel bag and wearing a ski mask, green hooded parka, jeans, and black gloves entered the Gurnee branch of NorthSide Community Bank, approached a teller, drew a gun, ordered a customer to the floor, and demanded that the teller fill the duffel bag with cash. After the first teller complied (while also managing to pass off some prerecorded bait bills from his drawer), the drive-thru teller received and followed the same instructions. The robber then, as we said, proclaimed his admiration for President Bush and rapidly pedaled away.

Once the police arrived, an officer realized he had just passed a man in a green parka riding a bicycle and heading toward a bike path in a wooded area. The officer drove his squad back in the direction of the cyclist and maneuvered onto the bike path, where he quickly found an abandoned bicycle—a green mountain bike. Parked nearby, at a distance of some 20 yards, was a green Chevy Blazer, which sat at the end of another road that led away from the bike path in a different direction. It was later learned that the Blazer was registered to the defendant's wife, Susan Renken.

The robber ultimately escaped, and the police began to investigate the area around the bicycle. One officer arrived in a squad car that he parked next to the Chevy Blazer; wearing gloves and taking care to avoid touching

---

[1] The dog's name is spelled Daisy "Mae" and Daisy "May" in various parts of the record. We prefer Daisy "Mae," recalling the voluptuous Daisy Mae who was hopelessly in love with Li'l Abner (while living in Dogpatch!) over the long run of Al Capp's classic comic strip.

the bike's seat, he moved the bike from its location and placed it near the squad car.

About 3 hours later, Gurnee police called in Kevin Tracz, chief of the Bannockburn police department and, more importantly for their purposes, the handler of Daisy Mae, a trained bloodhound. Daisy Mae was 9 months old and had been receiving training for use in police investigations for 6 months, including 163 training hours. (At trial, Tracz testified that, prior to the day of the robbery, Daisy Mae had only been used twice before on a real investigation.) When he arrived, Tracz instructed another officer to put the bike back where it was originally found. Once this was done, Tracz offered Daisy Mae the bicycle seat for a scent. She was then given a "find" command from which she promptly led Tracz to the Blazer. She first walked around the truck and then jumped on it, signaling to Tracz that she scored a hit.

After determining that the Blazer belonged to Renken's wife, a team of federal and local law enforcement officers converged on Renken's home in Lake Bluff, some 8 or so miles away. Three of them, two of whom carried exposed guns, approached the front door while others watched the rear of the house for anyone trying to leave. When Susan Renken answered, the three identified themselves, explained that they wanted to speak to her husband, and asked if they could come in. They then entered, although it is disputed whether Susan gave them permission to do so.

When asked who else was in the house, Susan explained that her husband was showering upstairs. The officers told her they needed to verify this for their own safety, and several proceeded upstairs, where they encountered Renken showering with the bathroom door ajar. Two FBI agents moved inside the bathroom, identified themselves to Renken, and told him they wanted to speak with him

after he had completed his shower. When he had done so, the agents escorted him downstairs to the kitchen where they found a green hooded parka with a fur-trimmed hood matching the description of the jacket worn by the bank robber. Meanwhile, a detective, still upstairs, noticed dirty and torn socks and shoes containing "broken bits of dried leaves [and] branches" in the bathroom.

Without issuing *Miranda* warnings, the agents began questioning Renken about the robbery. After he initially denied involvement, the police confronted him with several pieces of evidence tying him to the crime, including the trail picked up by Daisy Mae between the bike and the Blazer. Apparently convinced of the futility of his denials, Renken confessed and told the officers where to find the money and the gun he had used. He was then advised of his *Miranda* rights. And he proceeded to make a detailed oral confession before signing a written statement based on that confession. He also signed a consent to search his house and the Chevy Blazer. The police soon found the gun and the duffel bag filled with the money (including the marked bills) as Renken said they would: each was in a separate part of the wooded area through which he had fled that afternoon.

Before the trial, Renken moved for the suppression of his confessions, the evidence seized as a result of those confessions, and the signed consent to search, arguing that his Fourth and Fifth Amendment rights were violated. Judge Coar granted the motions with respect to the confessions, and the government was precluded from introducing them—and some physical evidence that was fruit of the confessions—at trial. But he refused to suppress the physical evidence seized from Renken's home and vehicle the night of the arrest. Because the judge concluded that Renken's wife consented to the officers entry into the home and that Renken's interactions with the officers had likewise been voluntary, he found that the

searches were exempted from the general Fourth Amendment prohibition against warrantless searches, as explained in *Schneckloth v. Bustamonte*, 412 U.S. 218, 219-22 (1973).

Renken disputes these conclusions. He argues that, under a *Schneckloth* analysis of the "totality of the circumstances" surrounding his and his wife's dealings with the officers, it is clear that neither acted voluntarily. Because this contention gives rise to questions of fact rather than law, Renken has the burden of showing that the judge's ruling was clearly erroneous. As we shall see, he has failed to do so.

The "totality of the circumstances" analysis looks to factors such as "age, education, and intelligence of the defendant; advisement of his rights; how long he was detained prior to the consent; repeated requests for consent; physical coercion; and whether he was in custody." *United States v. LaGrone*, 43 F.3d 332, 334 (7th Cir. 1994). Renken argues that this situation mirrors the one described in *United States v. Gillespie*, 650 F.2d 127, 128-29 (7th Cir. 1981), *cert. denied*, 458 U.S. 1111 (1982), in which the government argued that an entry and search was consensual in an effort to avoid the suppression of evidence seized during a search prompted by a warrant for the arrest of a third party who turned out not to be on the scene. In *Gillespie*, we held that, even though it was unclear from the record whether the officers were already inside when they received permission to search the house, the search could not have been consensual because "even if the agent[s] were outside, Gillespie could only have felt he had no choice but to let in the officers." *Id.* at 129.

The two cases are not without similarities: as in this case, armed federal agents and local police officers approached the front door while others watched the back of

the house, and the exact sequence of how the officers entered the house is in dispute. But their differences are the key: in *Gillespie* at least five "heavily armed" agents approached the house with guns drawn and in the "ready" position, declaring they were looking for three fugitives. Once inside, they immediately frisked Gillespie and then forced him to lead them through the house room by room as they followed with shotguns drawn.

Nothing like that happened here; the officers at the Renkens' door adopted a far less confrontational posture, and there was "no unnecessary display of weapons." *United States v. Rojas*, 783 F.2d 105, 108 (7th Cir. 1986). Renken offers nothing to suggest that his wife's age, education, or intelligence precluded her from understanding that she was consenting to the police entry into her home. Nor is there evidence that the officers repeatedly asked for or demanded entry. Indeed, Renken argues only that Susan did not expressly invite the officers in—a contention that the officers dispute and that in any event neglects to appreciate that consent in certain cases can be implied in the absence of clear verbal permission. Ultimately, in sorting out the facts, Judge Coar believed the version advanced by the police and thus concluded that Mrs. Renken's consent to the entry was voluntary. The judge's determination cannot be branded as clear error.

As for Renken's own signed consent to search, we have previously established that a consent to search can be voluntary—and therefore Fourth-Amendment-compliant—notwithstanding the fact that it was given while a defendant was in custody without having received *Miranda* warnings. *United States v. Bernitt*, 392 F.3d 873, 877 (7th Cir. 2004); *see also United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."). Here, Judge Coar looked

at the environment in which Renken was questioned and determined that he was in custody based on his lack of freedom to interrupt or terminate his conversation with the officers and the fact that he was confronted with evidence of his guilt. That conclusion required the suppression of Renken's confession made before he received *Miranda* warnings and, after *Missouri v. Seibert*, 124 S. Ct. 2601 (2004), of his confession after receiving those warnings. But that's as far as he can get on this ticket, for under *United States v. Patane*, 124 S. Ct. 2620, 2629 (2004), the failure to give *Miranda* warnings does not require the exclusion of evidence collected after a defendant gives a voluntary consent to search. Instead, the standard "totality of the circumstances" analysis applies.

On that point, Renken signed a consent to search form that contained, in express terms, an assurance that he was not required to give his consent. Although he consumed a single beer earlier in the day, there was no hint that the 47-year-old Renken was capable of being coerced or tricked into consenting, nor that the officers made such efforts. As Judge Coar pointed out, there was no allegation of physical coercion, and his interrogation lasted no more than 12 minutes. We cannot say that the district judge clearly erred in concluding that, under the totality of the circumstances, his consent to search the home and the Chevy Blazer was voluntary. The evidence seized from those searches was admissible at his trial.

Renken's other argument concerns Daisy Mae and her handler, Chief Tracz. Citing the pair's limited experience as a team with real police investigations, Renken argues that, under Rule 702 of the Federal Rules of Evidence (a codification of the *Daubert* rule), the judge should have excluded as unreliable Tracz's testimony about Daisy Mae's actions on the bike path. Because this presents a challenge to a decision about the admissibility of evi-

dence, we review only for an abuse of discretion. *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998).

Renken explains that Tracz received no special training on how to work with search dogs but instead used a training program provided by the North American Search Dog Network in order to train Daisy Mae. He points out that Daisy Mae had only been used for two investigations prior to November of 2002, and that, although Tracz testified that the dog had successfully completed an intermediate-level test provided by the training program (which involved tracking a 30- to- 60-minute-old trail over a half-mile distance), Daisy Mae had never received a certificate authenticating her efforts. Renken also invokes Tracz's own trial testimony that a young search dog must be worked regularly and notes that Daisy Mae missed a week or more of training time at several points during the year prior to the bank robbery. Finally, he argues that the trail Daisy Mae traced was contaminated, both because the bicycle had been temporarily moved and because a different dog and handler team had already searched the area.

The government contends that Daisy Mae and Tracz had more than enough experience and success to demonstrate their reliability. They argue that Tracz developed substantial knowledge of search dog training and methodology when he devoted 163 hours to Daisy Mae's training, and they note that in her two prior investigations Daisy Mae's findings were corroborated by other facts or tracking dogs. More generally, they point out that a majority of jurisdictions to consider the issue have found bloodhound tracking evidence to be admissible (although Illinois is an exception) and dog handler testimony to be an appropriate means for establishing the reliability of a particular dog.

From our vantage point, there may be some reason to question the reliability of Tracz's methods in this particu-

lar case, if only because of the apparent contamination of the search area caused by moving the bicycle. But unfortunately for Renken, it is apparent to us that "even if the district court had erred in its decision as to the admissibility of the proffered testimony, the evidence in this case was so overwhelming . . . that his conviction was not 'inconsistent with substantial justice.'" *United States v. Reed*, 259 F.3d 631, 635 (7th Cir. 2001). In other words, at worst the admission of Tracz's testimony was harmless error.

The major contribution of Tracz's testimony was to affirm that Daisy Mae detected a connection between the abandoned bicycle and the Blazer. Although this connection helped crack the case, it was not essential to the government's case against Renken at trial.[2] The government presented a mountain of incriminating evidence: six eyewitnesses from the bank who attested to various aspects of the robber's appearance, including his height, gender, and the green parka with fur-trimmed hood and black gloves that he was wearing; a police officer who noticed and followed the trail of a man wearing a green hooded parka and riding a green bicycle; the testimony of Renken's son that his father owned a green mountain bike; the bike itself found so close to the Blazer; a transaction report and receipt for Renken's purchase of "motor clothes" from Harley Davidson; a duffel bag found in the wooded area containing over $18,000 in cash and a Harley Davidson black leather glove; testimony that the recovered cash included the bait bills recorded by the bank; a .22 Lugar handgun also recovered from the wooded area, shown to have been purchased by a Ruth V. Renken in

---

[2] Plus, even without Daisy Mae, the police obviously noted a possible connection between the abandoned bike and the Blazer. The proximity, one to the other in a wooded area, made that quite obvious.

1973 and recalled by Henry Renken's ex-wife from their past visits to Ruth Renken's home; the dirty shoes and jeans spotted in Renken's bathroom by the FBI agent; and the key to the green Chevy Blazer found in the pocket of those jeans. The government's evidence against Renken, even without Tracz's testimony about Daisy Mae, was more than overwhelming.

For these reasons, Henry Renken's conviction is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*