*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAESHAWN DAVONTE BATES,

        Defendant-Appellant.

UNPUBLISHED
November 10, 2022

No. 359200
Berrien Circuit Court
LC No. 2020-002808-FH

Before: SAWYER, P.J., and MARKEY and SWARTZLE, JJ.

PER CURIAM.

The prosecution charged defendant under MCL 750.227(2) with carrying a concealed pistol in an automobile after the police pulled over defendant's vehicle for alleged traffic infractions. Police located a gun in defendant's car following his concession to an officer that a weapon was in the vehicle. Defendant moved to suppress his statement to the police about having the gun in his car and to suppress evidence of the gun itself. The district and circuit courts suppressed defendant's incriminating statement on the basis of a violation of *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). But the lower courts did not suppress evidence of the pistol found in defendant's automobile upon determining that the admission to the officer that a gun was present in the car was voluntarily given and that the stop had not been unduly prolonged by the police. This Court denied defendant's delayed application for leave to appeal. *People v Bates*, unpublished order of the Court of Appeals, entered on December 22, 2021 (Docket No. 359200). Our Supreme Court, however, in lieu of granting leave to appeal, remanded the case for consideration as on leave granted. *People v Bates*, 974 NW2d 828 (2022). We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

At defendant's preliminary examination, Michigan State Police Trooper Ian Fields testified that he stopped a sedan with an unusually loud, defective exhaust system after the vehicle did not come to a complete stop at a stop sign. When Trooper Fields went to the driver's-side door, he observed defendant "reaching around excessively" inside the car. Additionally, defendant could not produce any identification when requested by the trooper. In light of defendant's furtive movements and his lack of identification, Trooper Fields directed him to step out of the vehicle.

-1-

Trooper Fields then handcuffed defendant because he was exhibiting extremely nervous behavior and because he had no identification.[1] The trooper testified that defendant "was unable to really speak clearly due to his nervousness." Trooper Fields indicated that defendant was "temporarily detained" in handcuffs for the trooper's safety and protection and until defendant's identity could be confirmed. Upon placing the handcuffs on defendant, Trooper Fields, briefly and with additional officers standing nearby, repeatedly asked defendant if he had anything in the car such as drugs or a weapon that might be causing his anxiety and nervousness. And defendant finally admitted, at first with an affirmative nod of the head, that there was a pistol under his seat in the automobile. Defendant acknowledged that he did not have a concealed pistol license. Trooper Fields entered the vehicle and found the gun under the driver's seat; it was loaded and had a round in the chamber. After seizing the gun, the trooper read defendant his *Miranda* rights, and defendant agreed to talk to the police. Trooper Fields did not issue defendant a ticket for any civil or traffic infraction. Details of the interaction between defendant and Trooper Fields will be discussed below.

In the district court and upon completion of the proofs at the preliminary examination, defendant moved to suppress his un-*Mirandized* statement revealing the gun's presence in his car as well as evidence of the gun itself because defendant had been the subject of a custodial interrogation when he made the statement. The prosecution responded that defendant was not under arrest when he made the statement and that police officers are permitted to ask general questions during a traffic-stop investigation. The district court ruled that there was a *Miranda* violation because defendant had not been free to leave the scene, and it suppressed defendant's statement and evidence of the gun, characterizing the firearm as fruit of the poisonous tree. On the basis of its ruling excluding the evidence, the district court refused to bind defendant over to the circuit court and dismissed the charge.

The prosecutor moved for reconsideration, arguing that even if there was a *Miranda* violation that barred admission of defendant's statement to Trooper Fields, caselaw precedent clearly provided that evidence of the pistol remained admissible so long as the statement was voluntarily made to police. The prosecution maintained that defendant's statement was voluntary under the totality-of-the-circumstances test. In response, defendant argued that his statement to police that a gun was in the car was coerced and involuntary, as he was repeatedly badgered by Trooper Fields about whether there was contraband or a weapon in the vehicle and where defendant was in the foreboding presence of multiple officers. The district court agreed with the prosecution's stance regarding the exclusionary limits of *Miranda*—a violation did not preclude admission of the firearm, just suppression of the unwarned statement. Further, the district court agreed with the prosecutor that defendant's statement was voluntarily made and not coerced. In reaching this conclusion, the court reasoned that Trooper Fields' questioning was less than three minutes, that the questioning was out in the open on the street and not coercive, that the other officers who were present were simply standing around and not engaging in any intimidating or coercive behavior, that no threats were made against defendant, and that no physical force was

---

[1] Defendant claimed that he was nervous because shortly before being pulled over he had inadvertently left his wallet with his identification at a nearby gas station. Another officer serving as "backup" was indeed able to retrieve the wallet from the station.

used against him. The district court acknowledged that Trooper Fields questioned defendant multiple times about the presence of drugs or a gun in the car. But the court reiterated that the questioning was short-lived and opined that police interrogations often involve repeated questioning to some extent because "most defendants don't admit readily to their crimes," yet this does not automatically render their statements involuntary. Otherwise, according to the court, statements would regularly have to be declared involuntary and suppressed.

As part of the prosecution's motion for reconsideration, it had contended that the district court erred by finding a *Miranda* violation; however, the court remained steadfast in its view that defendant's statement was the product of a custodial interrogation. Consequently, the district court did not alter its ruling that defendant's statement was inadmissible given the *Miranda* violation. In response to the prosecutor's motion for reconsideration, defendant had asserted, in addition to his argument that his statement was involuntary, that evidence of the gun should be excluded because the evidence was discovered after Trooper Fields unduly prolonged the traffic stop absent probable cause to do so. The district court rejected this argument. In short, the district court ruled that defendant's statement was inadmissible, that evidence of the gun itself was admissible, that the prosecution's motion for reconsideration was thus granted in part and denied in part, that the charge was reinstated, and that there was probable cause to bind defendant over to the circuit court for trial.

In the circuit court, where, under a county concurrent jurisdiction plan, the case was presided over by the same judge who had handled the district court proceedings, defendant moved to suppress evidence of the gun's discovery in defendant's car. As argued previously, defendant posited that his statement to police was involuntary and that the traffic stop was unduly prolonged. On the basis of the law-of-the-case doctrine, the circuit court, pointing to its own decision when sitting as judge in the district court, rejected the argument that defendant's statement was involuntarily made to Trooper Fields. The circuit court further ruled that defendant's motion was effectively a motion for reconsideration, which the court denied because the arguments raised were no more persuasive than they were back in the district court. But the circuit court did elaborate in regard to the previously-rejected, unduly-prolonged-stop argument. The court found that the duration of the detention was under three minutes, which was "nowhere near a long stop," and that much of the delay was caused by the need to confirm defendant's identity, which delay was defendant's fault in leaving his identification behind at the gas station and could not be blamed on the police.

As noted, this Court denied defendant's delayed application for leave to appeal, *Bates*, unpub order at 1, but our Supreme Court, in lieu of granting leave to appeal, remanded the case for consideration as on leave granted, *Bates*, 974 NW2d at 828.

## II. ANALYSIS

### A. LAW-OF-THE-CASE DOCTRINE

-3-

Defendant first argues on appeal that the circuit court misapplied the law-of-the-case doctrine to preclude review of its own prior ruling at the district court level. In *Grievance Administrator v Lopatin*, 462 Mich 235, 259-260; 612 NW2d 120 (2000), our Supreme Court explained the nature of the law-of-the-case doctrine:

> Under the law of the case doctrine, if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same. The appellate court's decision likewise binds lower tribunals because the tribunal may not take action on remand that is inconsistent with the judgment of the appellate court. Thus, as a general rule, an appellate court's determination of an issue in a case binds lower tribunals on remand and the appellate court in subsequent appeals. [Citations and quotation marks omitted.]

The law-of-the-case doctrine does not apply to decisions of a trial court; therefore, a successor trial judge can correct errors or reexamine a decision made by a prior judge, and a trial court can reverse its own prior ruling. *Prentis Family Foundation, Inc v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 52-53; 698 NW2d 900 (2005).

As reflected in these principles governing the law-of-the-case doctrine, we conclude that the doctrine had absolutely no application whatsoever in the context of the instant case. The circuit court was not bound by its earlier ruling when sitting as a district court judge; the district court is not an appellate court, nor was the case before the circuit court in an appellate posture. There was simply a new motion to suppress filed in the circuit court after a bindover. The error, however, does not merit reversal and remand. The two other arguments posed by defendant on appeal are that evidence of the gun should have been suppressed because (1) the traffic stop was unduly prolonged and because (2) the statement by defendant to Trooper Fields about the gun was coerced and involuntary. The circuit court, while referencing the law-of-the-case doctrine, also treated defendant's motion as a motion for reconsideration and stated that it had not been persuaded to change its previous determinations relative to suppression of the gun evidence. Moreover, the court additionally offered new substantive reasoning in rejecting the unduly-prolonged-stop argument. In sum, regardless of the court's error with respect to the law-of-the-case doctrine, the court clearly also ruled against defendant independent of the doctrine and would plainly do so once again were we to reverse and remand the case. We therefore conclude that reversal is unwarranted.

## B. VOLUNTARINESS OF DEFENDANT'S STATEMENT

Defendant argues that the lower court erred by determining that his statement to Trooper Fields about the gun was not coerced and was made voluntarily. "When reviewing a trial court's determination of the voluntariness of inculpatory statements, this Court must examine the entire record and make an independent determination, but will not disturb the trial court's factual findings absent clear error." *People v Shipley*, 256 Mich App 367, 372-373; 662 NW2d 856 (2003). A trial court's finding amounts to clear error if this Court is left with a definite and firm conviction that a mistake was made. *Id.* at 373. "[D]eference is given to the trial court's assessment of the weight of the evidence and credibility of the witnesses." *Id.*

In *People v Campbell*, 329 Mich App 185, 203-204; 942 NW2d 51 (2019), this Court addressed the admissibility of evidence that was discovered as the result of a statement made in violation of *Miranda*:

The prosecution, citing *United States v Patane*, 542 US 630; 124 S Ct 2620, 159 L Ed 2d 667 (2004), argues that the two additional guns were admissible because Campbell's statement about the additional weapons was voluntary, even though the statement was elicited in violation of *Miranda*. In *Patane*, the Supreme Court focused on the protection afforded by the Self-Incrimination Clause of the Fifth Amendment, which it described as a prohibition on compelling a criminal defendant to testify against himself at trial. The Court reasoned that the right against compelled self-incrimination cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements. The Court further explained:

"Introduction of the nontestimonial fruit of a voluntary statement does not implicate the Self-Incrimination Clause. The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial. In any case, the exclusion of unwarned statements is a complete and sufficient remedy for any perceived *Miranda* violation. There is simply no need to extend (and therefore no justification for extending) the prophylactic rule of *Miranda* to the physical fruit of a voluntary, albeit unwarned, statement."

Even before *Patane*, the Michigan Supreme Court observed that application of the exclusionary rule to evidence obtained as a result of a *Miranda* violation is not a foregone conclusion because a violation of *Miranda* is not, in and of itself, a violation of the Constitution. Instead, when the prosecution failed to demonstrate that the defendant had adequately waived his privilege against self-incrimination and his right to counsel, but there was no evidence of coercive police conduct compelling the defendant's statements, the Court held that third-party testimony discovered as a result of the defendant's unwarned statements need not be suppressed. [Quotation marks, citations, brackets, and ellipses omitted.]

In this case, defendant argues that evidence of the pistol is inadmissible because his statement to Trooper Fields was involuntary and coerced. In *People v Cipriano*, 431 Mich 315, 333-334, 429 NW2d 781 (1988), the Michigan Supreme Court set forth the analysis that governs a determination whether a confession or statement was voluntary:

The test of voluntariness should be whether, considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired. The line of demarcation is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. [Quotation marks, citations, and ellipses omitted.]

The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness, and no single factor is dispositive. *People v Tierney*, 266 Mich App 687, 709; 703 NW2d 204 (2005).

In the present case, Trooper Fields testified, and dash-cam video confirmed, that after defendant stopped his vehicle and as the trooper approached the driver's-side door, defendant furiously reached about the front passenger compartment. Trooper Fields then made direct contact with defendant, who was the car's driver and its lone occupant. Defendant informed the trooper that he was looking for his wallet, which carried his identification, but he could not locate the wallet. Trooper Fields asked defendant to step out of the vehicle in light of defendant's furtive movements and his lack of identification. The trooper testified that he made this request within 30 seconds of coming into contact with defendant. Defendant told Trooper Fields that he left his identification at a nearby gas station that he had just patronized. Defendant repeatedly expressed concern about his wallet and asked for someone to retrieve his wallet from the gas station. Defendant appeared very nervous and distracted. He was intently focused—to the point of distraction—on his missing wallet and identification, such that he did not appear to hear what Trooper Fields was saying or asking. For example, defendant put his hands in his pockets immediately after being told by the trooper not to do so, and his answers to questions posed by Trooper Fields did not always reflect proper responses.

Trooper Fields attempted to calm defendant down by advising him that he was not concerned about or interested in defendant's "weed" and that they would figure out what had happened to his wallet and identification. The video confirmed Trooper Fields's testimony that once outside of the vehicle, defendant "continued to make some motions, like he was trying to get back to the car, and was moving around quite a bit." The trooper warned defendant at least twice not to return to the vehicle. Because of defendant's extreme nervousness and lack of identification, and for Trooper Fields's own safety, the trooper placed defendant in handcuffs and "temporarily detained him." Once defendant was handcuffed, Trooper Fields asked defendant seven times over the course of approximately 120 seconds what defendant had in the vehicle that was making him

so nervous. With respect to several of these inquiries, the trooper specifically asked defendant if there was a gun in the car. Trooper Fields asked defendant to be honest and real with him, and the trooper offered to "work" with defendant in return. Trooper Fields touched, grabbed, and held defendant at times, but it was not in an aggressive, offensive, or threatening manner; rather, it was done more in a guiding and calming manner to keep the fidgety defendant from worrying and wandering off and to redirect his attention to the questioning. Because defendant repeatedly expressed concern about his missing wallet and identification and appeared very distracted, it is not clear that defendant was focused on or actually mentally processed what Trooper Fields was asking him.[2] As a consequence, the trooper's repetition of the same question was more likely attributable, at least in part, to trying to get defendant to focus on the question being asked. During this same period of time, the trooper twice asked defendant his name and attempted to assuage defendant's concern over his missing wallet. Trooper Fields asked defendant to "take it down" and to "relax."

During the questioning, two additional troopers arrived on the scene and stood on either side of defendant, approximately 10 feet away from defendant. The video further revealed that a patrol car from the local police department arrived on the scene as did another two state police cruisers. After Trooper Fields asked for the seventh time whether there was contraband in the car, defendant nodded affirmatively when the trooper specifically inquired about a firearm. Defendant then told Trooper Fields where the gun was located in the vehicle.

On the basis of this record, we cannot conclude that the circuit court clearly erred by finding that defendant's statement was voluntarily made. Undoubtedly, Trooper Fields put some pressure on defendant to admit that there was contraband or a firearm in defendant's vehicle. But the trooper's conduct did not reach the level at which defendant's will was overborne and his capacity for self-determination was critically impaired; instead, defendant's concession was the product of an essentially free and unconstrained choice by defendant. Indeed, our repeated viewing of the video footage demonstrated to this panel that Trooper Fields treated defendant in a professional, respectful, disciplined, and courteous manner. We patently find that the questioning was not prolonged, that the length of time defendant was detained before he made the statement was short, that defendant was not injured, intoxicated, drugged, or in ill health, that defendant had not been deprived of food, sleep, or medical attention, that defendant was not physically abused, and that the police did not threaten defendant with abuse. See *Cipriano*, 431 Mich at 333-334. As previously noted, defendant presented as nervous, fidgety, and wholly unfocused. Consequently, Trooper Fields' repeated questions could certainly and reasonably be attributed to an effort to make sure that defendant was fully aware of the questions that the trooper was posing to defendant, as opposed to an effort to procure a coerced admission. Moreover, the video reflected that while additional officers arrived at the scene, none of them engaged in any conduct or posturing that can be described as threatening, intimidating, coercive, or otherwise improper.

We hold that the lower court did not clearly err when it found that defendant voluntarily informed the trooper of the firearm's presence in the vehicle. The short interrogation did not

---

[2] We of course recognize that defendant's nervousness and lack of focus were also likely due to the fact that he had a firearm in his vehicle.

disclose circumstances of coercive police conduct compelling defendant's statement. And Trooper Fields was free to question defendant about the presence of weapons in defendant's vehicle because the question constituted a negligibly burdensome precaution taken to ensure the safety of the responding officers. *Campbell*, 329 Mich App at 198-199 (a police officer is free to question a motorist about the presence of weapons in his or her vehicle because the question pertains to part of the mission of the traffic stop, i.e., a negligibly burdensome precaution employed to ensure the officer's safety). Reversal is unwarranted.

## C. LENGTH OF THE TRAFFIC STOP

Defendant contends that Officer Fields prolonged the traffic stop beyond the time necessary to accomplish its mission, thereby violating defendant's right to be free from unreasonable searches and seizures. Thus, according to defendant, the court erred by ruling that the prosecution could present evidence of the gun at trial. In *People v Kavanagh*, 320 Mich App 293, 300-301; 907 NW2d 845 (2017), this Court observed:

> Until the 2015 decision of the United States Supreme Court in *Rodriguez* [*v United States*, 575 US 348; 135 S Ct 1609; 191 L Ed 2d 492 (2015)], there was debate about whether requiring a driver to wait for a dog sniff after a traffic stop had concluded should be considered a seizure separate from the traffic stop itself or whether the basis for the traffic stop could encompass a brief additional delay for a dog sniff. In *Rodriguez*, the United States Supreme Court definitively resolved the debate, holding that a dog sniff is not fairly characterized as part of the officer's traffic mission. The Court explained that although police officers may conduct certain unrelated checks during an otherwise lawful traffic stop, they may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. The Court held [that a] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. Once the constitutionally sound basis for the traffic stop has been addressed, any further extension of the detention in order to conduct on-scene investigation into other crimes or for any other reason is a Fourth Amendment violation unless new facts come to light during the traffic stop that give rise to reasonable suspicion of criminal activity. [Quotation marks, citations, and brackets omitted.]

As previously indicated, when Trooper Fields conducted the traffic stop, defendant could not produce any identification; he had no driver's license with him. That defendant had no identification constituted a new fact that gave rise to the trooper's authority to investigate whether defendant was operating a motor vehicle without a valid operator's license. This is because it is a misdemeanor to drive a motor vehicle without a valid operator's or chauffeur's license, MCL 257.301; MCL 257.901, and it is a misdemeanor to fail to display a license upon demand of a police officer, MCL 257.311; MCL 257.901. To further Trooper Fields's investigation, he needed to know defendant's name. The trooper could then conduct a computer check to determine whether anyone with the name given to him had a valid driver's license. Second, Trooper Fields needed to confirm that defendant was who he claimed to be via a photo identification, which the trooper could obtain through confirmation of defendant's claim that he left his wallet and identification at the gas station.

A review of the dash-cam video revealed that Trooper Fields asked defendant his name three times. The third time that he was asked his name, defendant identified himself as Daeshawn Bates. Defendant gave the trooper his name 3 minutes and 35 seconds into the traffic stop. A few moments later, defendant admitted to having the pistol in his car. Then, shortly thereafter, the backup police officer arrived with defendant's wallet and identification that the officer had retrieved from the gas station. On this record, we cannot conclude that Trooper Fields had unduly or unnecessarily prolonged the traffic stop leading up to defendant's admission, at which point, given the admission, the trooper had probable cause to enter and search defendant's vehicle. Once again, reversal is unwarranted.

We affirm.

/s/ David H. Sawyer
/s/ Jane E. Markey
/s/ Brock A. Swartzle