*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

JASON SCOTT CAMPBELL,

      Defendant-Appellee.

FOR PUBLICATION
July 23, 2019
9:10 a.m.

No. 344078
Mackinac Circuit Court
LC No. 18-003947-FH

Before: SAWYER, P.J., and O'BRIEN and LETICA, JJ.

PER CURIAM.

In this interlocutory appeal, plaintiff appeals by leave granted[1] an order granting a motion in limine filed by defendant, Jason Scott Campbell. The prosecution charged Campbell with three counts of carrying a concealed weapon in a vehicle, MCL 750.227, after Campbell disclosed the presence of the weapons in his vehicle in response to officer questioning during a traffic stop. On Campbell's motion, the trial court suppressed all three firearms and Campbell's statements concerning the same. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

On January 19, 2018, Campbell was traveling in a pickup truck and pulling a trailer, on which sat a welding truck he had recently purchased in Minnesota for use in his business. A motor carrier officer (MCO) noticed that a taillight on Campbell's trailer was not working and signaled for Campbell to pull over. The MCO testified that he believed Campbell's vehicle was commercial because of its size and the equipment Campbell was pulling (the welding truck), which the MCO described as similar to a truck, but with unusual equipment mounted to it. The MCO testified that Campbell's pickup truck also had the name of a business, a symbol, and a

---

[1] *People v Campbell*, unpublished order of the Court of Appeals, entered October 12, 2018 (Docket No. 344078).

phone number displayed on the tailgate, but did not have carrier identification displayed on the sides as required by state and federal regulations.[2] The absence of proper carrier identification did not lead the MCO to believe the vehicle was noncommercial because, in his experience, some drivers are unaware of the requirements applicable to commercial vehicles traveling across state lines.

The traffic stop was recorded, although some of Campbell's responses are difficult to hear. The MCO approached Campbell's vehicle at 7:52 a.m., introduced himself, and advised Campbell that the right taillight on his trailer was out. The MCO asked Campbell about the nature of his travel and Campbell explained that he was traveling from Minnesota to West Branch, Michigan, to pick up a "bobcat" for a friend. The MCO then asked Campbell whether he had any guns or weapons in the vehicle. The MCO testified that he asked Campbell about the presence of weapons because Campbell seemed nervous and Campbell's hands remained on the steering wheel. In the MCO's experience, individuals who have a concealed pistol license (CPL) often exhibit similar behavior. Campbell admitted that he had a firearm, prompting the MCO to ask if Campbell had a CPL. Campbell answered that he did not, but explained that he lived in New Mexico, where he did not need a license or permit to carry a firearm in his vehicle.[3] The MCO confirmed that the gun was loaded and advised Campbell that he intended to verify the gun's registration. The MCO retrieved the gun, as well as Campbell's license and registration.

From the patrol car, the MCO radioed a sheriff's deputy for assistance. The MCO summarized his discovery of the gun and made different statements about whether Campbell's vehicle was commercial. The MCO stated his uncertainty about whether Campbell's vehicle was commercial and, thus, whether the MCO had jurisdiction to conduct the traffic stop,[4] but also expressed his belief that Campbell might be lying to him. When the sheriff's deputy arrived and

---

[2] The MCO later learned that, despite the business logo and information appearing on the tailgate, Campbell's pickup truck and the attached trailer were registered to Campbell personally.

[3] In its written decision granting Campbell's motion and suppressing evidence obtained during the traffic stop, the trial court repeated Campbell's assertion. In its appellate brief, plaintiff asks whether the trial court erred by considering New Mexico gun laws when evaluating the legality of the detention. Plaintiff raises no argument on this issue, nor do we read the trial court's decision as drawing a legal conclusion on the basis of its observation about New Mexico gun laws. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Therefore, we decline to address this issue.

[4] MCOs have "all powers conferred upon peace officers for the purpose of enforcing the general laws of this state as they pertain to commercial vehicles." MCL 28.6d(1). While on duty, an MCO is also authorized to make an arrest without a warrant if the MCO "has reasonable cause to believe that a felony has been committed and reasonable cause to believe that the person [arrested] committed it." MCL 28.6d(2)(b).

indicated that he could not "take over" a traffic stop initiated by the MCO, the MCO remained uncertain as to how to proceed and radioed his sergeant for guidance.

After consulting with his sergeant, the MCO returned to Campbell's vehicle and advised Campbell that he would be taken to jail for carrying a concealed gun without a CPL. The MCO asked Campbell if he had any more weapons in the vehicle, and Campbell disclosed two additional guns. After handcuffing Campbell and placing him in the patrol car, the MCO and the sheriff's deputy searched Campbell's vehicle and located the two additional weapons. The MCO then read Campbell his *Miranda*[5] rights and questioned Campbell further about the guns.

The trial court granted Campbell's motion in limine, noting that "[t]here was no insignia on [Campbell's] vehicle to suggest he was registered as a commercial vehicle," and that the MCO quickly came to the conclusion that Campbell was not a commercial carrier. The trial court found no evidence to support the MCO's justification for initially asking Campbell about weapons in the vehicle, i.e. that Campbell was acting nervous, and determined that the MCO's subsequent questioning about additional weapons constituted custodial interrogation without the benefit of *Miranda* warnings. Accordingly, the trial court suppressed all of the evidence from the traffic stop, including Campbell's admissions about the weapons and the weapons themselves.

## II. STANDARDS OF REVIEW

We review constitutional issues and the application of the exclusionary rule de novo. *People v Jones*, 260 Mich App 424, 427; 678 NW2d 627 (2004). The trial court's factual findings with respect to a motion to suppress are reviewed for clear error. *People v Waclawski*, 286 Mich App 634, 693; 780 NW2d 321 (2009). "A finding is clearly erroneous when it leaves this Court with a definite and firm conviction that the trial court made a mistake." *Id*. When the record contains a video recording of the events in question, however, this Court "need not rely on the trial court's conclusions as to what the video contains." *People v Kavanaugh*, 320 Mich App 293, 298; 907 NW2d 845 (2017). We review de novo questions of statutory interpretation. *People v Anderson*, 501 Mich 175, 182; 912 NW2d 503 (2018).

## III. ANALYSIS

### A. COMMERCIAL VEHICLE

Plaintiff first defends the MCO's authority to make the traffic stop, arguing that Campbell's vehicle was commercial and that the MCO made a reasonable mistake of fact or law when he determined that Campbell's vehicle was not commercial. Despite repeatedly referring to the MCO's conclusion that the vehicle was not commercial, the trial court did not analyze the relevant statutes or make that finding itself. Instead, the trial court premised suppression of the evidence on constitutional principles embodied in the Fourth and Fifth Amendments. Nonetheless, in the interest of judicial expediency and to provide guidance on remand, we will

---

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

briefly address plaintiff's contention that Campbell was operating a commercial vehicle when he was pulled over by the MCO.

This Court's primary goal in construing a statute is to determine and give effect to the intent of the Legislature, turning first to the statutory language to ascertain that intent. *People v Baham*, 321 Mich App 228, 237; 909 NW2d 836 (2017). In construing a statute, we interpret defined terms in accordance with their statutory definition and undefined terms according to their ordinary and generally accepted meaning. *People v Giovannini*, 271 Mich App 409, 413; 722 NW2d 237 (2006). "[W]hen statutory language is unambiguous, judicial construction is not required or permitted because the Legislature is presumed to have intended the meaning it plainly expressed." *People v Weeder*, 469 Mich 493, 497; 674 NW2d 372 (2004).

MCL 28.6d(1) authorizes the director of the Michigan State Police to "appoint officers with limited arrest powers for motor carrier enforcement." "Such officers . . . shall have all powers conferred upon peace officers for the purpose of enforcing the general laws of this state as they pertain to commercial vehicles." *Id*. The Michigan Vehicle Code, MCL 257.1 *et seq*., defines the term "commercial vehicle" to include

> all motor vehicles used for the transportation of passengers for hire, or constructed or used for transportation of goods, wares, or merchandise, and all motor vehicles designed and used for drawing other vehicles that are not constructed to carry a load independently or any part of the weight of a vehicle or load being drawn. Commercial vehicle does not include a limousine operated by a limousine driver, a taxicab operated by a taxicab driver, or a personal vehicle operated by a transportation network company driver. [MCL 257.7.]

Plaintiff contends that Campbell's pickup truck and trailer satisfied this definition of a commercial vehicle. We agree. Campbell's pickup truck was a "vehicle that is self-propelled," and was therefore a "motor vehicle." MCL 257.33. While the pickup truck itself may not have fully satisfied the above-quoted statutory definition of a commercial vehicle, it is highly relevant that Campbell was pulling a trailer at the time he was stopped by the MCO. In pertinent part, the Michigan Vehicle Code defines a "vehicle" as "every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except devices exclusively moved by human power or used exclusively upon stationary rails or tracks . . . ." MCL 257.79. Although the evidence concerning the nature of the trailer is limited, it was clearly used to transport property under the power of the pickup truck to which it was attached. Additionally, it was not self-propelled in any manner, nor of a size or class that would permit transportation of its load without motive power from another vehicle or motor vehicle. Thus, we agree that Campbell's pickup truck was a "motor vehicle[] designed and used for drawing other vehicles that are not constructed to carry a load independently or any part of the weight of a vehicle or load being drawn." MCL 257.7.

While we recognize that the Michigan Vehicle Code separately defines the term "commercial *motor* vehicle," MCL 257.7a (emphasis added), and, in doing so, includes a personal-use exception, it is unnecessary at this juncture to consider whether that exception was applicable to Campbell. First, Campbell indicated that the welding truck he was transporting on the trailer was for use in his business. The pickup truck itself also bore a business name and

-4-

telephone number on the tailgate, suggesting it, too, was used in Campbell's business. Thus, he was not using the pickup truck and trailer "exclusively to transport personal possessions or family members for *nonbusiness* purposes." MCL 257.7a(2) (emphasis added). Second, even if we determined that Campbell was not operating a commercial vehicle and that the MCO, therefore, did not have authority to initially detain Campbell under MCL 28.6d, exclusion of the evidence would not be the automatic remedy. See *People v Hamilton*, 465 Mich 526, 532-534; 638 NW2d 92 (2002) (stating that the "exclusionary rule only applies to constitutionally invalid arrests," and "statutory violations do not render police actions unconstitutional"), abrogated in part on other grounds by *Bright v Ailshie*, 465 Mich 770, 775 n 5; 641 NW2d 587 (2002). Consequently, we do not consider this issue dispositive.

## B. INITIAL INQUIRIES LEADING TO DISCOVERY OF THE FIRST GUN

Plaintiff next argues that the MCO could lawfully ask Campbell if he had a weapon in the vehicle at the beginning of the traffic stop and that the MCO had authority to extend the stop once Campbell admitted he had a loaded weapon in the vehicle and no CPL. We agree.

The Fourth Amendment protects against unlawful searches and seizures. *People v Stevens (After Remand)*, 460 Mich 626, 634; 597 NW2d 53 (1999). "[A] 'seizure' within the meaning of the Fourth Amendment occurs when, in view of all the circumstances, a reasonable person would conclude that he or she was not free to leave." *Kavanaugh*, 320 Mich App at 300. A traffic stop amounts to a seizure under the Fourth Amendment, and it is "justified if the officer has an articulable and reasonable suspicion that a vehicle or one of its occupants is subject to seizure for a violation of law." *People v Simmons*, 316 Mich App 322, 326; 894 NW2d 86 (2016) (quotation marks and citation omitted). Whether a reasonable suspicion justifies a traffic stop depends on a common-sense view of the totality of the circumstances. *People v Dillon*, 296 Mich App 506, 508; 822 NW2d 611 (2012). "An officer's conclusion must be drawn from reasonable inferences based on the facts in light of his training and experience." *People v Steele*, 292 Mich App 308, 315; 806 NW2d 753 (2011).

Michigan has recognized that "[a] traffic stop is reasonable as long as the driver is detained only for the purpose of allowing an officer to ask reasonable questions concerning the violation of law and its context for a reasonable period." *People v Williams*, 472 Mich 308, 315; 696 NW2d 636 (2005). In *Rodriguez v United States*, 575 US ___, ___; 135 S Ct 1609, 1614; 191 L Ed 2d 492 (2015), the United States Supreme Court repeated this proposition, analogizing a routine traffic stop to a *Terry*[6] stop and stating that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission[.]' " Thus, authority for the traffic stop ends when "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' " *Id*. at ___; 135 S Ct at 1615 (citation omitted; alteration in original). The Court further held that the "mission" of a traffic stop includes attending to related safety concerns, such that officers are permitted to "take certain

---

[6] *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

negligibly burdensome precautions in order to complete [the] mission safely." *Id*. at ___; 135 S Ct at 1614, 1616. On the other hand, when an officer's inquiries are unrelated to the mission of the seizure—that is, unrelated "to address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns," *id*. at ___; 135 S Ct at 1614—those inquiries can withstand constitutional scrutiny only when they "do not measurably extend the duration of the stop," *id*. at ___; 135 S Ct at 1615 (quotation marks and citation omitted).

In a factually analogous case, the Supreme Court of Wisconsin recently considered whether, in the absence of reasonable suspicion, an officer conducting a traffic stop could ask a detained motorist whether he or she had a weapon in the vehicle and whether the motorist held a permit to carry a concealed weapon. *State v Wright*, ___ Wis 2d ___, ___; 2019 WI 45; 926 NW2d 157, 159 (2019). Relying largely on *Rodriguez* and Wisconsin caselaw interpreting the same, the Court held that the officer was free to question the motorist about the presence of weapons in the vehicle because the question pertained to part of the mission of the traffic stop— it was "a negligibly burdensome precaution taken to ensure officer safety." *Id*. at ___; 926 NW2d at 163. In contrast, the Court determined that the officer's follow-up question regarding the motorist's concealed weapon permit did not relate to the purpose of the traffic stop. *Id*. at ___; 926 NW2d at 164. The Court explicitly rejected the state's argument that the inquiry was also related to officer safety, reasoning that "[i]t is the potential presence of a weapon that implicates the safety of the officer, not whether the weapon is being lawfully carried . . . ." *Id*. However, despite its determination that the permit inquiry was unrelated to the mission of the stop, the Court still concluded that the question did not offend the constitutional prohibition against unreasonable search and seizure because the question was asked while "mission-related activities were occurring" and did not measurably extend the duration of the stop. *Id*. at ___; 926 NW2d at 166.

Although we are not compelled to reach the same result, we agree with *Wright*'s analysis of this issue. See *People v Jackson*, 292 Mich App 583, 595 n 3; 808 NW2d 541 (2011) ("We are not bound by the decisions of . . . courts of other states, but we may consider them to be persuasive authority."). The *Wright* Court's opinion is well-reasoned and consistent with binding precedent from both the United States Supreme Court and the Supreme Court of this state. See *Rodriguez*, 575 US ___, ___; 135 S Ct at 1614-1616 (explaining that the lawful duration of a traffic stop is determined by the time necessary to complete mission related activities, including those involving officer safety, and the Fourth Amendment tolerates certain unrelated investigations that do not lengthen the roadside detention); *Williams*, 472 Mich at 315 ("A traffic stop is reasonable as long as the driver is detained only for the purpose of allowing an officer to ask reasonable questions concerning the violation of law and its context for a reasonable period."). As the United States Supreme Court has repeatedly recognized, a police officer conducting a traffic stop is faced with legitimate dangers arising from the stop. See *Maryland v Wilson*, 519 US 408, 413; 117 S Ct 882; 137 L Ed 2d 41 (1997) (noting statistics concerning officer assaults and deaths during traffic pursuits and stops); *Michigan v Long*, 463 US 1032, 1049; 103 S Ct 3469; 77 L Ed 2d 1201 (1983) ("[R]oadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect."); *Pennsylvania v Mimms*, 434 US 106, 110; 98 S Ct 330; 54 L Ed 2d 331 (1977) (describing "inordinate risk confronting an officer as he approaches a person seated in an automobile"). The concern for officer safety in an inherently dangerous situation provides a compelling reason to permit police officers to take preventative action

designed to ensure they are able to complete the traffic stop safely. We hold, therefore, that a police officer is free to question a lawfully detained person about the presence of weapons in his or her vehicle because such an inquiry relates to the officer's ability to conduct the traffic stop in a safe manner. *Rodriguez*, 575 US ___, ___; 135 S Ct at 1614-1616.

In this case, the MCO initiated the traffic stop because Campbell had a broken taillight. Campbell has not contested this fact or the understanding that the broken taillight violated a requirement of the Michigan Vehicle Code. See *People v Williams*, 236 Mich App 610, 615; 601 NW2d 138 (1999) (holding that "a motor vehicle equipped with multiple tail lamps is in violation of [MCL 257.686(2)] if one or more of its tail lamps is inoperative"). Less than 90 seconds after the MCO approached Campbell's vehicle and began conversing with him, the MCO became concerned that Campbell might be armed and asked if there were any weapons in the vehicle. After Campbell acknowledged having a handgun in his driver-side door, the MCO asked Campbell if he had a CPL. Campbell answered no. The MCO then took possession of the gun to verify its registration and determine what course of action was appropriate. The trial court determined that the MCO's explanation for believing Campbell may be armed was incredible and impliedly held that the MCO's questions and resulting investigation caused an unreasonably long detention.

The trial court erred in this regard because the legality of the MCO's questions does not turn on the credibility of his beliefs. The MCO's first question concerning the presence of weapons in the vehicle was designed to ensure that the he could complete the traffic stop safely and was, therefore, related to the purpose of the stop. *Rodriguez*, 575 US ___, ___; 135 S Ct at 1614, 1616. And although the MCO's next question regarding whether Campbell possessed a CPL was not strictly related to the purpose of the stop, the question itself did not unreasonably prolong the duration of the stop. Consequently, it did not render the otherwise lawful stop unconstitutional. *Id*. at ___; 135 S Ct at 1614-1615. See also *Wright*, ___ Wis 2d at ___; 926 NW2d at 166. Thereafter, in light of Campbell's early admissions, there was probable cause to believe that Campbell had committed the felony of carrying a concealed weapon and the MCO could lawfully extend the stop to investigate the matter. *Williams*, 472 Mich at 315 ("[W]hen a traffic stop reveals a new set of circumstances, an officer is justified in extending the detention long enough to resolve the suspicion raised."). See also MCL 28.6d(2)(b) (extending an MCO's limited arrest authority to circumstances in which the MCO "has reasonable cause to believe that a felony has been committed and reasonable cause to believe that the person committed it").

Having concluded that the MCO's initial questions at the outset of the stop did not violate the Fourth Amendment protection against unreasonable search and seizure, we further conclude that neither Campbell's responses to those questions nor the first gun should have been suppressed. "The exclusionary rule is a judicially created remedy that originated as a means to protect the Fourth Amendment right of citizens to be free from unreasonable searches and seizures" by barring admission of "materials seized and observations made during an unconstitutional search." *People v Hawkins*, 468 Mich 488, 498-499; 668 NW2d 602 (2003). Because Campbell's admissions regarding the first gun and his lack of a CPL, as well as the MCO's seizure of the first gun, were not the product of an unconstitutional search or seizure, the trial court erred by suppressing that evidence.

C. LATER QUESTIONING LEADING TO DISCOVERY OF SECOND AND THIRD GUNS

With respect to the MCO's later questioning and Campbell's admissions regarding the second and third guns in his vehicle, the trial court said:

> It is abundantly clear that [Campbell] was not read his *Miranda* rights until some time after his arrest and the admission of [Campbell] to the MCO . . . about the other two weapons in the vehicle. Given all of the events in the general sequence, as further described below and not withstanding an argument for inevitable discovery, . . . the Court finds that the admissions of [Campbell] as to the other weapons in the vehicle, and the seizure of the same, must be suppressed.

Plaintiff does not challenge the suppression of Campbell's secondary, unwarned statements about the additional guns in the vehicle, which the trial court properly suppressed. Instead, plaintiff argues that the two additional guns themselves are admissible.

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." US Const, Am V. To protect this right, police officers must advise a defendant of certain rights before a custodial interrogation. *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "[A] motorist detained for a routine traffic stop or investigative stop is ordinarily not in custody within the meaning of *Miranda*." *Steele*, 292 Mich App at 317. However, *Miranda* warnings "are required when a person is in custody or otherwise deprived of freedom of action in any significant manner." *People v Roark*, 214 Mich App 421, 423; 543 NW2d 23 (1995). "Whether a defendant is in custody for purposes of *Miranda* at the time of an interrogation is determined by looking at the totality of the circumstances, with the key question being whether the accused reasonably could have believed that he or she was free to leave." *People v Jones*, 301 Mich App 566, 580; 837 NW2d 7 (2013). "If the custodial interrogation is not preceded by an adequate warning, statements made during the custodial interrogation may not be introduced into evidence at the accused's criminal trial." *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013).

In this case, after a sergeant instructed the MCO to arrest Campbell, the MCO returned to Campbell's vehicle and advised Campbell that he would be arrested for having a gun in his vehicle without being licensed to carry a concealed weapon. Campbell was undoubtedly in custody at that point as no reasonable person could have believed he or she was free to leave. *Jones*, 301 Mich App at 580. Nonetheless, without advising Campbell of his rights as required by *Miranda*, the MCO proceeded to ask Campbell if he had any other weapons in the vehicle, prompting Campbell to disclose the location of two additional loaded guns. Because Campbell was clearly in custody when the MCO questioned him about additional weapons and had not received necessary *Miranda* warnings, the trial court correctly ruled that Campbell's statement regarding the second and third guns was inadmissible. *Elliott*, 494 Mich at 301. However, it does not necessarily follow that the guns discovered following Campbell's unwarned admission are inadmissible. See *People v Frazier*, 478 Mich 231, 247; 733 NW2d 713 (2007) (explaining that suppression is a harsh remedy and used only as a last resort).

Plaintiff, citing *United States v Patane*, 542 US 630; 124 S Ct 2620; 159 L Ed 2d 667 (2004), argues that the two additional guns were admissible because Campbell's statement about

the additional weapons was voluntary, even if that statement was elicited in violation of *Miranda*. In *Patane*, the Supreme Court focused on the protection afforded by the self-incrimination clause of the Fifth Amendment, which it described as "a prohibition on compelling a criminal defendant to testify against himself at trial." *Id*. at 637. The Court reasoned that the right against compelled self-incrimination "cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." *Id*. The Court further explained:

> Introduction of the nontestimonial fruit of a voluntary statement . . . does not implicate the Self-Incrimination Clause. The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial. In any case, "[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy" for any perceived *Miranda* violation. There is simply no need to extend (and therefore no justification for extending) the prophylactic rule of *Miranda* to [the physical fruit of a voluntary, albeit unwarned, statement]. [*Id*. at 643 (citations omitted; first alteration in original).]

Even before *Patane*, the Michigan Supreme Court observed that application of the exclusionary rule to evidence obtained as a result of a *Miranda* violation is not a foregone conclusion because a violation of *Miranda* is not, in and of itself, a violation of the constitution. *People v Kusowski*, 403 Mich 653, 661; 272 NW2d 503 (1978). Instead, where the prosecution failed to demonstrate that the defendant had adequately waived his privilege against self-incrimination and right to counsel, but there was no evidence of coercive police conduct compelling the defendant's statements, the Court held that third-party testimony discovered as a result of the defendant's unwarned statements need not be suppressed. *Id*. at 659-662.

Given our own precedent in *Kusowski* and the Supreme Court's clear ruling on this issue in *Patane*, the trial court erred by suppressing the second and third guns as a result of the MCO's failure to give Campbell *Miranda* warnings before questioning him about the presence of additional weapons. As stated by the Supreme Court in *Patane*: "[P]olice do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *Patane*, 542 US at 641. Physical evidence obtained as a result of an unwarned statement remains admissible as long as the statement was voluntary. *Id*. at 634, 637, 643-644. It is only the physical fruits of an actually coerced statement that must be suppressed to serve the deterrent purpose of the exclusionary rule. *Id*. at 643-644. The trial court made no finding that Campbell's secondary admission was involuntary and, therefore, erred by suppressing the second and third guns on the basis of a *Miranda* violation.

## IV. CONCLUSION

We affirm the trial court's suppression of Campbell's statement that he had additional weapons in the vehicle. We reverse the trial court's suppression of the three guns and Campbell's statement about the first gun in the vehicle. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Colleen A. O'Brien
/s/ Anica Letica